202 P.3d 1226

The SIERRA CLUB, a California non-profit corporation registered to do business in the State of Hawaii; Maui Tomorrow, Inc., a Hawaii non-profit corporation; and the Kahului Harbor Coalition, an unincorporated association, Plaintiffs–Appellants/Cross–Appellees/Appellees/Cross–Appellants,

v.

The DEPARTMENT OF TRANSPORTATION OF the STATE OF HAWAII; Brennon Morioka, in his capacity as Director of the Department of Transportation of the State of Hawaii; Michael Formby, in his capacity as Director of Harbors of the Department of Transportation of the State of Hawaii; Hawaii Superferry, Inc., Defendants–Appellees/Cross–Appellants/Appellants/Cross–Appellees.

No. 29035.

Supreme Court of Hawai'i.

March 16, 2009.

As Amended May 13, 2009.

184

Isaac Hall, Wailuku, for Plaintiffs–Appellants/Cross–Appellees/Appellees/Cross–Appellants The Sierra Club; Maui Tomorrow, Inc.; and the Kahului Harbor Coalition.

Lisa M. Ginoza, First Deputy Attorney General, (Mark J. Bennett, Attorney General, Dorothy Sellers, Solicitor General, with her on the briefs) for Defendants–Appellees/Cross–Appellants/Appellants/Cross–Appellees The Department of Transportation of the State of Hawai'i; Brennon Morioka, in his capacity as Director of the Department of Transportation of the State of Hawai'i; Michael Formby, in his capacity as Director of Harbors of the Department of Transportation of the State of Hawai'i.

Lisa Woods Munger (Bruce L. Lamon and Lisa A. Bail with her on the briefs) (Goodsill Anderson Quinn & Stifel), Honolulu, for Defendants–Appellees/Cross–Appellants/Appellants/Cross–Appellees Hawaii Superferry, Inc.

Opinion of the Court by DUFFY, J.

Plaintiffs–Appellants/Cross–Appellees/Appellees/Cross–Appellants the Sierra Club, Maui Tomorrow, Inc., and the Kahului Harbor Coalition [1] (collectively "Sierra Club") ap-

---

1. The Sierra Club is a California non-profit corporation registered to do business in the State of Hawai'i; Maui Tomorrow, Inc. is a Hawai'i non-

peal from the January 31, 2008 final judgment of the circuit court[2] and the November 14, 2007 circuit court order granting dissolution of the injunction and vacating the order to void the operating agreement. Sierra Club cross-appeals from the March 27, 2008 circuit court order granting attorney's fees and costs. Defendants–Appellees/Cross–Appellants/Appellants/Cross–Appellees State of Hawai'i Department of Transportation (DOT); Brennon Morioka, in his capacity as Director of DOT; Michael Formby, in his capacity as Director of Harbors of DOT (collectively "DOT") appeal from the January 31, 2008 final judgment and the March 27, 2008 order granting attorney's fees and costs. Defendants–Appellees/Cross–Appellants/Appellants/Cross–Appellees Hawaii Superferry, Inc. (Superferry) appeals and cross-appeals from the January 31, 2008 final judgment, the November 14, 2007 order granting dissolution of the injunction and vacating the order to void the operating agreement, the October 9, 2007 order granting enforcement of the environmental assessment (EA) requirement and permanent injunction, the November 9, 2007 circuit court findings of fact and conclusions of law, and the March 27, 2008 order granting attorney's fees and costs.

The main issue to be determined in this appeal is whether Act 2 enacted in the second special session of the 2007 legislature is constitutional. Sierra Club challenges the constitutionality of Act 2 on three separate grounds: (1) Act 2 is unconstitutional special legislation; (2) Act 2 violates the separation of powers doctrine; and (3) Act 2 violates the due process rights of Sierra Club and the public.

Based on our analysis herein, we hold that Act 2 is unconstitutional as it is a special law in violation of Article XI, section 5 of the Hawai'i Constitution.

## I. BACKGROUND

### A. First Review by This Court: Sierra Club I

This court's first review in *Sierra Club v. Department of Transportation of the State of Hawai'i* (*Sierra Club I*), 115 Hawai'i 299, 167 P.3d 292 (2007), provides the initial background for this case:

The Hawaii Superferry project generally involves an inter-island ferry service between the islands of O'ahu, Maui, Kaua'i, and Hawai'i, using harbor facilities on each island. According to a permit application filed with the Public Utilities Commission (PUC) on July 22, 2004, Hawaii Superferry, Inc. has proposed to develop and operate a high-speed roll-on/roll-off ferry service, using two vessels, capable of carrying up to 866 passengers and 282 cars, or 26 trucks or buses and 65 cars per trip. As a result of negotiations between the State and Hawaii Superferry, Inc., DOT concluded that several improvements to Kahului Harbor were necessary to accommodate the Superferry project, including the construction of a removable barge to Pier 2 of the harbor and other improvements to assist in Superferry operations. According to to DOT, "[t]he state anticipates the barge will cost as much as $10 million," and the State of Hawai'i has allocated a total of approximately $40,000,000 in state funds for improvements to the four harbors that will be utilized by the Superferry project.

Appellants, consisting of two nonprofits and one unincorporated association, are environmental groups whose members use the area around Kahului harbor in various ways. The Sierra Club is one of the nation's largest environmental organizations, with over 700,000 members, approximately 5,000 of which live in Hawai'i. The Sierra Club has a Hawai'i Chapter and a Maui group, which are involved in educating the public about Hawaii's natural resources through hikes, exploring wild places and natural resources, restoring and preserving eco-systems through service trips, and protecting open space through lobbying and litigation. Maui Tomorrow is described by a member as a "Maui island-wide environmental group which has participated in numerous environmental issues

---

profit corporation; and the Kahului Harbor Coalition is an unincorporated association.

**2.** The Honorable Joseph E. Cardoza presided.

including but not limited to the environmentally sound growth of [ ] airport and harbor infrastructures." The Kahului Harbor Coalition is "an organization of farmers, businessmen, recreational users and citizens formed out of concern about the increased risks of alien species introductions through Kahului Harbor."

*Id.* at 305–06, 167 P.3d at 298–99 (footnote omitted) (brackets in original).

In *Sierra Club I*, Sierra Club argued that: (1) the circuit court erred in dismissing Appellants' claim on the basis of standing because Appellants are among those injured by potential adverse impacts caused by the Hawaii Superferry project, and also because they suffer a procedural injury; (2) the circuit court erred in granting summary judgment in favor of Appellees by ruling that they complied with [Hawai'i Environmental Policy Act (HEPA)], because the exemptions were illegal and did not apply; (3) the circuit court erred in dismissing, as premature, Appellants' claim that the Hawaii Superferry project must be incorporated into the ongoing [environmental assessment (EA)] for Kahului Harbor Improvements, because the harbor exemptions were unlawfully segmented from the already initiated but incomplete EA; and (4) the circuit court erred in refusing to continue the hearing to permit further discovery because there was a factual dispute as to what was before DOT in making its exemption determination.

*Id.* at 305, 167 P.3d at 298.

On August 23, 2007, this court issued an order

reversing the July 12, 2005 circuit court judgment, holding that DOT's determination that the improvements to the Kahului Harbor are exempt from the requirements of [Hawai'i Revised Statutes (HRS)] chapter 343 was erroneous as a matter of law, and instructing the circuit court to enter summary judgment in favor of Appellants on their claim as to the request for an EA.

*Id.* The case was also remanded "for such other and further disposition of any remaining claims as may be appropriate." *Id.* at 343, 167 P.3d at 336. On August 31, 2007,

this court filed its opinion in *Sierra Club I* in support of its August 23, 2007 order.

On October 3, 2007, this court filed its judgment on appeal in *Sierra Club I*, stating:

Pursuant to the opinion of the Supreme Court of the State of Hawai'i entered on August 31, 2007, the final judgment of the Circuit Court of the Second Circuit entered on July 12, 2005 is vacated and, in accordance with this court's August 23, 2007 order, the circuit court is instructed to enter summary judgment in favor of Appellants on their claim as to the request for an environmental assessment and the case is remanded for such other and further disposition of any remaining claims as may be appropriate.

B. *Circuit Court Proceedings Following Sierra Club I Order*

1. **Summary Judgment Granted**

On August 23, 2007, the circuit court entered summary judgment in favor of Sierra Club on its claim requesting an EA, pursuant to this court's order. On August 27, 2007, Sierra Club moved ex parte for a temporary restraining order (TRO), pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 65(b), to enjoin DOT and Superferry

from using the barge attached to Pier 2 at the Kahului Harbor or any of [sic] "premises" or state lands granted by [DOT] to [Superferry] at the Kahului Harbor for the passenger terminal, for inspection and ticketing and for roadways to and from Pier 2 and the non-harbor Kahului roadway system, unless and until [DOT] has achieved full prior compliance with the mandatory procedural obligations under HRS [c]hapter 343.

2. **Temporary Restraining Order Granted**

On August 27, 2007, the circuit court granted Sierra Club's ex parte motion for a TRO stating the following:

1. On August 24, 2007, this Court entered summary judgment in favor of [Sierra Club] on the claim requiring the preparation of an [EA], pursuant to Chapter 343.

2. By HRS Section 343-5(b):

Acceptance of a required final statement shall be a condition precedent to approval of the request and commencement of proposed action.

3. By Chapter 343, acceptance of a required statement is a "condition precedent":

a. To the commencement or implementation of a proposed project, HRS Section 343–5(c); [Hawai'i Administrative Rules (HAR)] Section 11–200–23(d); and

b. To the use of state lands or funds in implementing the proposed action. HRS Section 343–5(b); HAR Section 11–200–23(c); and

c. To the issuance of approvals or entitlements for the project, HRS Section 343–5(c); HAR Section 11–200–23(d); *Kepoo v. Kane,* 106 Hawai'i 270, 103 P.3d 939 (2005); *KSOA v. County of Maui,* 86 Hawai'i 66, 947 P.2d 378 (1997).

4. "Acceptance" refers to the acceptance of an EIS, the entry of a Finding of No Significant Impact ("FONSI") and/or Exemption Determination. *Kepoo v. Kane,* 106 Hawai'i 270, 103 P.3d 939 (2005).[sic] *KSOA v. County of Maui,* 86 Hawai'i 66, 947 P.2d 378 (1997).

5. At present, there is no "acceptance" of this project pursuant to Chapter 343.

6. The proposed action or project is:

a. The barge to load and unload vehicles and passengers between [Superferry] and Pier 2 of the Kahului Harbor, Kahului, Maui, Hawai'i;

b. Operational support to accommodate the [Superferry], including the provision of utilities (water, power and lighting); security fencing (separating the premises granted to [Superferry] from other state lands); pavement striping (of the roadways from the Pier connecting to local highways as well as the staging areas for ticketing and inspection of passengers and vehicles); the placement of boarding gangway ramps; and the installation of tents at inspection points or customer waiting areas (for passenger terminals);

c. The state lands granted by [DOT] to [Superferry] to use for the [Superferry] project at the Kahului Harbor;

d. The [Superferry] project or action that is facilitated by the harbor improvements, since these harbor improvements are a condition precedent or prerequisite to [Superferry] operations. *KSOA v. County of Maui,* 86 Hawai'i 66, 947 P.2d 378 (1997); *Citizens for the Protection of the North Kohala Coastline v. County of [Hawai'i],* 91 Hawai'i 94, 979 P.2d 1120 (1999).

7. A [TRO] is necessary without notice to [DOT and Superferry] to avoid immediate and irreparable injury in this case because (1) despite the entry of summary judgment in favor of [Sierra Club], [Superferry] and [DOT] are moving forward with implementation of the [Superferry] project at the Kahului Harbor possibly rendering meaningless this Court's requirement that an [EA] be prepared; (b) [sic] [DOT and Superferry] may be violating the prohibitions in Chapter 343 against the implementation of a project and the use of state lands for that project while an EA is being prepared; (c) [sic] if [Superferry] operations are to be halted, there will be less harm to customers who need to be returned to their ports of origin if action is taken at the earliest date; (d) [sic] [DOT and Superferry] are risking actual harm to the environment that may best be explored through the preparation of an EA prior to the implementation of the action.

Based upon the foregoing, [DOT and Superferry], their subordinates, agents, attorneys, and all other persons acting in concert or participation with them who have actual knowledge of this Order, are prohibited from the following until the Court's decision on [Sierra Club's] Motion for Preliminary Injunction, such period not to exceed ten (10) days from the grant of this order [3] unless this Court extends the order for good cause shown:

A. [Superferry] is prohibited from using the barge attached to Pier 2 at the

3. The circuit court filed a stipulation and order on September 4, 2007 continuing the hearing

Kahului Harbor or any of the "premises" or state lands granted by [DOT] to [Superferry] at the Kahului Harbor for the passenger terminal, for inspection and ticketing and for roadways to and from Pier 2 and the non-harbor Kahului roadway system.

B. [DOT] is prohibited from permitting [Superferry] from [sic] using the barge attached to Pier 2 at the Kahului Harbor or any "premises" or state lands granted by [DOT] to [Superferry] at the Kahului Harbor for the passenger terminal, for inspection and ticketing and for roadways to and from Pier 2 and the non-harbor Kahului roadway system.

C. To mitigate any harm to customers whom [Superferry] has already transported to Maui, [Superferry] is required to immediately offer to return such a customer to his or her "home" port or port of origin, to promptly return any such customer so desiring to return to his or her "home" port or port of origin, and thereafter to immediately cease operations at Kahului Harbor, as provided in Paragraphs A and B above.

D. The issue of security may be addressed at the hearing on [Sierra Club's] Motion to Enforce Judgment Requiring [EA] by Prohibiting Implementation of Hawaii Superferry Project and for Temporary, Preliminary and/or Permanent Injunction.[4]

(Some formatting altered.)

Also on August 27, 2007, Sierra Club filed a motion to enforce the judgment requiring an EA and for an injunction prohibiting the implementation of the Superferry project.

### 3. Permanent Injunction Granted, Operating Agreement Voided, and Attorney's Fees and Costs Authorized

On October 9, 2007, the circuit court granted Sierra Club's request to enforce the judgment and permanently enjoin Superferry and DOT from implementing the Superferry project at Kahului Harbor while an EA was being prepared. The court found and concluded, among other things that: (1) Sierra Club already prevailed on the merits of its claim that an EA must be prepared; (2) Sierra Club demonstrated the possibility of irreparable injury with respect to environmental impacts of Superferry's operations; and (3) the public interest in the environmental review process supported the grant of a permanent injunction.

#### a. *permanent injunction*

Regarding the permanent injunction, the court further ordered:

a. A permanent injunction is hereby issued prohibiting [Superferry] from using the barge attached to Pier 2 at the Kahului Harbor, in Kahului, Maui, Hawai'i or any of "premises" or state lands granted by [DOT] to [Superferry] at the Kahului Harbor for the passenger terminal, for inspection and ticketing and for roadways to and from Pier 2 and the non-harbor Kahului roadway system.

b. A permanent injunction is hereby issued prohibiting [DOT] from permitting

---

date until September 10, 2007 and extending the TRO to the same date.

4. On August 31, 2007, the circuit court filed a stipulation and order amending its prior order granting the TRO. The stipulation and order clarified and amended the TRO by adding the following paragraph:

E. Notwithstanding anything herein to the contrary, Paragraph C. above is clarified to provide that [Superferry] is permitted to use the barge attached to Pier 2 at the Kahului Harbor or any of the "premises" or state lands granted by [DOT] to [Superferry] at the Kahului Harbor for the passenger terminal, for inspection and ticketing and for roadways to and

from Pier 2 and the non-harbor Kahului roadway system for the sole purpose of a single voyage of the Hawaii Superferry in and out of Kahului Harbor to return any customers or vehicles originally traveling aboard Hawaii Superferry on Sunday, August 26, 2007 and Monday, August 27, 2007, to their "home" port of origin, and [DOT] is permitted to allow [Superferry] such use. [Superferry] shall provide [Sierra Club], [DOT] and this Court with twenty-four hour advance notification of the date and times of the anticipated arrival at Kahului Harbor and the anticipated departure from Kahului Harbor of this single voyage of the Hawaii Superferry.

[Superferry] from using the barge attached to Pier 2 at the Kahului Harbor or any of "premises" or state lands granted by [DOT] to [Superferry] at the Kahului Harbor for the passenger terminal, for inspection and ticketing and for roadways to and from Pier 2 and the non-harbor Kahului roadway system.

c. This permanent injunction shall remain in full, [sic] force and effect while the Environmental Assessment ... is being prepared and until the environmental review process required by HRS Chapter 343 and the underlying regulations, HAR §§ 11–200–1 et. seq., has been lawfully concluded.

b. *operating agreement*

Regarding the operating agreement between DOT and Superferry, the circuit court ordered:

As it relates to the Kahului Harbor in Kahului, Maui, Hawai'i, the Harbors Operating Agreement entered into on the 7th day of September, 2005 between [DOT] and [Superferry], as amended on the 25th of October, 2005, is hereby declared void because it was not preceded by the requisite [EA] which was a condition precedent to approval of the request and commencement of the proposed action. HRS § 343–5.

c. *attorney's fees and costs*

Additionally, the circuit court authorized Sierra Club to request attorney's fees and costs, stating: "Plaintiffs, as the prevailing parties, may, by separate motion, file a request for the reimbursement of their reasonable attorney's fees and costs incurred in this case."

C. *Legislative Proceedings: Act 2*

On October 23, 2007, Governor Linda Lingle issued a Proclamation convening both houses of the legislature in special session to consider legislation on two issues, including "legislation to allow the immediate commencement of operation of a large capacity inter-island ferry." Both houses of the legislature convened in the second special session of the 2007 Legislature on October 24, 2007.

On November 2, 2007, "A Bill for An Act Relating to Transportation" was signed by the governor and became Act 2.2d Spec. Sess.2007 Haw. Sess. Laws Act 2, §§ 1–18 at 5–21.

The purpose of the act was stated as follows:

(d) The purpose of this Act is to facilitate the establishment of inter-island ferry service and, at the same time, protect Hawaii's fragile environment by clarifying that neither the preparation of an [EA], nor a finding of no significant impact, nor acceptance of an environmental impact statement shall be a condition precedent to, or otherwise be required prior to:

(1) The operation of a large capacity ferry vessel company pursuant to any certificate of public convenience and necessity approved by the public utilities commission;

(2) The operation of a large capacity ferry vessel company and large capacity ferry vessel between any port or harbor in Hawaii pursuant to any written operating agreement;

(3) The construction, use, or operation of any improvements at Kahului harbor and any other harbor in the state relating to the operation of a large capacity ferry vessel company or large capacity ferry vessel;

(4) The appropriation or expenditure of any funds, the use of state lands, the issuance of any permits, or the entering into of any agreements; or

(5) The taking of any other necessary or appropriate actions for the purpose of facilitating any matter covered by paragraphs (1) to (4), notwithstanding the fact that the non-preparation or non-completion of environmental assessments or environmental impact statements, the lack of acceptance of an environmental impact statement, or the lack of a finding of no significant impact, would otherwise have barred, delayed, been a condition precedent to, or interfered with the same; provided that upon commencement of inter-island ferry service, the

large capacity ferry vessel company shall comply with the conditions and protocols established under this Act, and with any additional conditions and protocols set by the governor by executive order, or subsequently established by the legislature by law.

(e) The purpose of this Act is also to amend all relevant existing laws to provide that, while any environmental review and studies, including environmental assessments or environmental impact statements, are prepared and following their completion:

(1) A large capacity ferry vessel company and large capacity ferry vessels may operate;

(2) Agreements with respect to such operation, including the operating agreements, entered into between the State and a large capacity ferry vessel company may be enforced, executed, or re-executed; and

(3) Related harbor improvements may be constructed and used by the State, by a large capacity ferry vessel company, and by others.

Act 2, § 1(d)-(e) at 6–7.

On November 4, 2007, the governor notified the legislature that she had established conditions and protocols pursuant to Act 2 in Executive Order No. 07–10, which "establishes conditions and protocols for a large capacity ferry vessel company's inter-island operations." Pursuant to Act 2 and the additional conditions provided by Executive Order No. 07–10, Superferry and the State of Hawai'i executed an agreement on November 4, 2007, wherein Superferry agreed to abide by conditions and protocols that reflected those established in Executive Order No. 07–10. The agreement stated that it "shall remain in full force and effect at all times Act 2 is in effect." Act 2 provides that it shall be repealed on the earlier of "(1) The forty-fifth day, excluding Saturdays, Sundays, and holidays, following adjournment sine die of the regular session of 2009; or (2) Upon acceptance of the final environmental impact statement as provided in this Act[.]" Act 2, § 18 at 20. By its own express language, Act 2 will be repealed no later than July 31, 2009,

and thus has a maximum viability of twenty-one months. *See infra* Part IV.A.2.c.i.

D. *Circuit Court Proceedings Following Act 2*

1. **Findings of Fact and Conclusions of Law**

On November 9, 2007, the circuit court issued findings of fact and conclusions of law in support of its October 9, 2007 decision granting a permanent injunction against Superferry and DOT. The circuit court's conclusions of law state, in relevant part:

> Pursuant to HRS Chapter 343, there can be no action to implement the project in this case pending completion of the [EA] process.... [Sierra Club's] request for a permanent injunction is hereby granted[.]

The circuit court also found, in the alternative, that Sierra Club was entitled to a permanent injunction based on the traditional balancing tests. The circuit court stated:

> 24. The Court is mindful of the financial impact that an injunction would impose on the Hawaii Superferry Project, its employees, and the taxpayers.

> 25. The purpose of HRS Chapter 343 is to protect the environment, not the economic interests of those adversely affected by agency decisions.

> 26. While [DOT] and [Superferry] may have expended a [sic] substantial funds and resources on the Hawaii Superferry Project, monetary loss is not a sufficient basis for forbearing to issue an injunction. *Stop H–3 Association v. Volpe*, 353 F.Supp. 14 (D.Hawai'i, 1972); *Highland Cooperative v. City of Lansing*, 492 F.Supp. 1372 (USDC, W.D.Michigan, 1980).

> 27. Financial losses do not outweigh the interest in environmental protection whenever the two clash, as they often do.

> 28. Financial harm is not the sort of unusual circumstance that justifies a Court's refusal to enjoin any type of environmental protection violation. *Malama Makua v. Rumsfeld*, 163 F.Supp.2d 1202, 1221 (D.Haw.2001); *Thomas v. Peterson*, 753 F.2d 754, 764 n. 8 (9th Cir.1985).

29. [Superferry], [DOT], and the State Department of Agriculture and those working with or for the State have done a great deal to bring to this community and state a meaningful transportation alternative that is responsive to the concerns of the community and the transportation needs of this state.

30. The efforts of those who have moved the Hawaii Superferry forward, however, cannot serve as a replacement for a complete environmental assessment process required by HRS Chapter 343 and the Hawaii Administrative Rules that apply to the environmental review process.

31. After applying the traditional balancing tests for injunctive relief, and utilizing this Court's legal and equitable powers as they relate to the issuance of injunctive relief, the Court concludes that injunctive relief should and must issue.

## 2. Injunction Dissolved and Order Voiding Operating Agreement Vacated

On November 5, 2007, Superferry and DOT moved to dissolve the injunction and vacate the order voiding the operating agreement between DOT and Superferry. In support of its motion, Superferry stated:

As the court knows (and indeed as every citizen of Hawaii who has read a newspaper or watched a newscast in the past few weeks knows), the Hawaii State Legislature swiftly responded to the decisions made by the Hawaii Supreme Court and by this court in this case, by enacting Act 2 of the Second Special Session of 2007.

The nature of that response is a change to the law applicable to large capacity ferry vessel companies operating in the State, including [Superferry]. Under this changed law, it is no longer illegal or improper for [Superferry] to operate during the environmental review process.

Just as the August 2007 Supreme Court rulings required this court to change its July 2005 ruling, the legislative response to the Supreme Court rulings now requires this court to change its October 9, 2007, [sic] order to comply with the new law. Specifically, this court should alter the prospective effect of its order by dissolving the injunction prohibiting use of Kahului Harbor improvements by defendants and should vacate that portion of the order that voids part of the operating agreement.

Also on November 5, 2007, Sierra Club moved for voluntary dismissal of its remaining claims [5] and entry of final judgment.

On November 13, 2007, Sierra Club filed a memorandum in opposition to Superferry and DOT's motions to dissolve the injunction and vacate the order voiding the operating agreement. Sierra Club requested evidentiary hearings to: (1) determine what irreparable harm would be caused by dissolving the injunction; (2) demonstrate that Superferry was the only entity meant by the term "large capacity ferry vessel company" in Act 2; and (3) determine "whether there remains any need to continue the injunction or whether the purposes of the litigation as incorporated into the decree have been served."

On November 14, 2007, the circuit court granted DOT's and Superferry's motions to dissolve the injunction and vacate the order voiding the operating agreement. In the final paragraph of the November 14, 2007 order, the circuit court stated:

judgment was to be entered in Sierra Club's favor on its request for an EA; (2) the grant of summary judgment in favor of Sierra Club on its request for an EA; (3) the grant of injunctive relief against DOT and Superferry; (4) this court's determination that count II of the first amended complaint was no longer justiciable; (5) the circuit court's finding and conclusion that the operating agreement was void; (6) the circuit court's findings of fact and conclusions of law on the EA requirement; and (7) the determination that Sierra Club was a prevailing party.

---

5. Sierra Club described its remaining claims as "all potential residual, remaining claims ('Remaining Claims') arising from the Counts or factual allegations asserted in the First Amended Complaint, with the express exception of those Claims, Counts or factual allegations addressed in paragraph C., subparagraphs 1. through 7. above." Paragraph C listed the claims that had been finally resolved in favor of Sierra Club and against Superferry and DOT as: (1) this court's determination that DOT's exemption was erroneous as a matter of law, the EA requirement of HRS § 343–5 was applicable, and summary

IT IS HEREBY FURTHER OR-DERED that paragraph D of the order granting Plaintiffs' motion to enforce judgment requiring environmental assessment by prohibiting implementation of Hawaii Superferry Project, for temporary, preliminary and/or permanent injunction, filed herein on October 9, 2007, authorizing Plaintiffs, as the prevailing parties, to, by separate motion, file a request for the reimbursement by [Superferry] of their reasonable attorney's fees and costs incurred shall remain in effect.

On January 15, 2008, Sierra Club filed a motion for reimbursement of reasonable attorney's fees and costs.

On January 31, 2008, the circuit court granted Sierra Club's motion for voluntary dismissal of its remaining claims and entry of final judgment. The motion was granted as follows:

A. On August 24, 2007, the above Court entered its Order Entering Summary Judgment in Favor of Plaintiffs on Claim for Environmental Assessment. On October 9, 2007, the above Court entered its Order Granting Plaintiffs' Motion to Enforce Judgment Requiring Environmental Assessment by Prohibiting Implementation of the Hawaii Superferry Project, for Temporary, Preliminary and/or Permanent Injunction. On November 2, 2007, Act 2 (Second Special Session 2007) was signed into law by the Honorable Linda Lingle, Governor of the State of Hawai'i. On November 14, 2007, the above Court entered its Order Granting (1) [DOT's] Motion to Dissolve Injunction and Vacate Order Voiding Operating Agreement; and (2) [Superferry's] Motion to Dissolve Injunction and Vacate Order Voiding Operating Agreement ("Order Granting Motion to Dissolve").

B. Count I of the First Amended Complaint herein, by virtue of the Legislature's enactment of Act 2 and this Court's Order Granting Motions to Dissolve, is now moot and dismissed with prejudice in its entirety.

C. Count II of the First Amended Complaint herein, alleging a claim relating to the Draft Environmental Assessment for the Kahului Harbor Improvements dated June 2004 is dismissed without prejudice in its entirety.

D. Count III of the First Amended Complaint herein, by virtue of the Legislature's enactment of Act 2 and this Court's Order Granting Motions to Dissolve, is now moot and dismissed with prejudice in its entirety.

E. Count IV of the First Amended Complaint herein, by virtue of the Legislature's enactment of Act 2 and this Court's Order Granting Motions to Dissolve is now moot and dismissed with prejudice in its entirety.

F. Count V of the First Amended Complaint herein, by virtue of the Legislature's enactment of Act 2 and this Court's Order Granting Motions to Dissolve, is now moot and dismissed with prejudice in its entirety.

G. A Final Judgment shall be entered pursuant to this Order.

On January 31, 2008, the circuit court issued its final judgment. The final judgment dismissed the claims as outlined in the order granting Sierra Club's motion for voluntary dismissal and added the following:

Paragraph D of the Order Granting Plaintiffs' Motion to Enforce Judgment Requiring Environmental Assessment by Prohibiting Implementation of Hawaii Superferry Project, for Temporary, Preliminary and/or Permanent Injunction, filed herein on October 9, 2007, authorizing Plaintiffs to, by separate motion, file a request for the reimbursement by [Superferry] of their reasonable attorney's fees and costs incurred shall remain in effect unless otherwise ordered by the above Court.

This Final Judgment resolves all claims as to all parties. There are no further claims or parties remaining in this action. Any and all other claims, cross-claims or counterclaims are hereby dismissed.

On February 29, 2008, Sierra Club filed a timely notice of appeal. On March 13, 2008, DOT filed a notice of cross-appeal. On March 14, 2008, Superferry filed a notice of cross-appeal.

On March 27, 2008, the circuit court granted Sierra Club's motion for reimbursement of reasonable attorney's fees and costs. The court stated that it had not given weight to fifteen exhibits submitted by Sierra Club in an attempt to challenge Superferry's claim of reliance in good faith on DOT's exemption determination. Superferry had raised the claim of reliance in good faith to avoid an award of attorney's fees against it based on HRS § 607–25.[6]

The court then stated the following,

The Court hereby grants Plaintiffs' Motion for Reimbursement of Reasonable Attorney's Fees and Costs . . ., in part, based upon HRS § 607–25 and the Private Attorney General Doctrine, and awards Plaintiffs, with the exceptions noted on the record, attorney's fees, at the hourly rate of $200 per hour, and costs, both commencing as of August 24, 2007. The total amount of attorney's fees hereby awarded is $86,270.28. The total amount of costs hereby awarded is $5,442.44. The total amount of attorney's fees and costs hereby

---

6. HRS § 607–25 provides:

(a) As used in this section, "development" includes:

(1) The placement or erection of any solid material or any gaseous, liquid, solid, or thermal waste;

(2) The grading, removing, dredging, mining, pumping, or extraction of any liquid or solid materials; or

(3) The construction or enlargement of any structure requiring a discretionary permit.

(b) As used in this section, "development" does not include:

(1) The transfer of title, easements, covenants, or other rights in structures or land;

(2) The repair and maintenance of existing structures;

(3) The placement of a portable structure costing less than $500; or

(4) The construction of a structure which only required a building permit and for which a building permit could be granted without any discretionary agency permit or approval.

(c) For purposes of this section, the permits or approvals required by law shall include compliance with the requirements for permits or approvals established by chapters 6E, 46, 54, 171, 174C, 180C, 183, 183C, 184, 195, 195D, 205, 205A, 266, 342B, 342D, 342F, 342H, 342J, 342L, and 343 and ordinances or rules adopted pursuant thereto under chapter 91.

(d) For purposes of this section, compliance with the procedural requirements established by chapter 343 and rules pursuant to chapter 343 constitute a discretionary agency approval for development.

(e) In any civil action in this State where a private party sues for injunctive relief against another private party who has been or is undertaking any development without obtaining all permits or approvals required by law from government agencies:

(1) The court may award reasonable [attorney's] fees and costs of the suit to the prevailing party.

(2) The court shall award reasonable [attorney's] fees and costs of the suit to the prevailing party if the party bringing the civil action:

(A) Provides written notice, not less than forty days prior to the filing of the civil action, of any violation of a requirement for a permit or approval to:

(i) The government agency responsible for issuing the permit or approval which is the subject of the civil action;

(ii) The party undertaking the development without the required permit or approval; and

(iii) Any party who has an interest in the property at the development site recorded at the bureau of conveyances.

(B) Posts a bond in the amount of $2,500 to pay the [attorney's] fees and costs provided for under this section if the party undertaking the development prevails.

(3) Notwithstanding any provisions to the contrary in this section, the court shall not award [attorney's] fees and costs to any party if the party undertaking the development without the required permit or approval failed to obtain the permit or approval due to reliance in good faith upon a written statement, prepared prior to the suit on the development, by the government agency responsible for issuing the permit or approval which is the subject of the civil action, that the permit or approval was not required to commence the development. The party undertaking the development shall provide a copy of the written statement to the party bringing the civil action not more than thirty days after receiving the written notice of any violation of a requirement for a permit or approval.

(4) Notwithstanding any provision to the contrary in this section, the court shall not award [attorney's] fees and costs to any party if the party undertaking the development applies for the permit or approval which is the subject of the civil action within thirty days after receiving the written notice of any violation of a requirement for a permit or approval and the party undertaking the development shall cease all work until the permit or approval is granted.

HRS § 607–25 (1993 & Supp.2007).

awarded is $91,712.72. Defendants [Superferry] and [DOT] shall pay this total amount of attorney's fees and costs to Plaintiffs.

On April 3, 2008, DOT filed its notice of appeal. On April 4, 2008, Superferry filed its notice of appeal. On April 15, 2008, Sierra Club filed its notice of cross-appeal. On October 14, 2008, we granted Sierra Club's application for transfer of the appeal to this court pursuant to HRS § 602–58(a)(1) (Supp. 2007). On December 18, 2008, we held oral argument.

## II. CONTENTIONS ON APPEAL

### A. Sierra Club's Appeal and Cross–Appeal

Sierra Club states as its points of error on appeal:

1. The Circuit Court erred in granting [DOT's] and Superferry's Motions to Dissolve Injunction and Vacate Order Voiding Operating Agreement, by dissolving the permanent injunction, by vacating the Order voiding the Operating Agreement and by not ruling that Act 2 is unconstitutional. . . .

2. The Circuit Court erred thereafter by entering a Final Judgment dismissing the claims in Sierra Club's Complaint, as amended, as moot.

On cross-appeal, Sierra Club states as its points of error:

1. The Circuit Court did not err in (a) awarding reasonable attorney's fees and costs to Sierra Club, or (b) basing the award on HRS § 607–25 and/or the Private Attorney General Doctrine, or (c) requiring these fees and costs to be paid by [DOT] and [Superferry], or (d) requiring payment of not less than the amount of $91,712.72. [sic] at the rate of at least $200 per hour. . . .

2. The Circuit Court erred, however, in entering its Order Granting Plaintiff's Motion for Reimbursement of Reasonable Attorney's Fees and Costs by not awarding fees for that period of litigation in the Circuit Court prior to the initial Supreme Court appeal. . . .

3. The Circuit Court erred in entering its Order Granting Plaintiffs' Motion for Reimbursement of Reasonable Attorney's Fees and Costs by not taking into consideration and giving weight to the documents presented by the Sierra Club on the issue of whether [DOT] or Superferry "relied in good faith." . . .

4. The Circuit Court erred in entering its Order Granting Plaintiffs' Motion for Reimbursement of Reasonable Attorney's Fees and Costs by not awarding fees at the modestly enhanced amount of $300.00 per hour.

### B. DOT's Appeal and Cross–Appeal

DOT filed a notice of cross-appeal on March 13, 2008 as well as a notice of appeal on April 3, 2008. DOT filed a single opening brief on appeal on July 8, 2008, which stated as its point of error:

The circuit court erred in awarding fees and costs to the non-prevailing parties, whether that award was made under a purported application of the private attorney general doctrine or some other theory.

### C. Superferry's Appeal and Cross–Appeal

Similarly, Superferry filed a notice of cross-appeal on March 14, 2008 and a notice of appeal on April 4, 2008. Superferry filed a single opening brief on July 8, 2008, which stated as its points of error:

1. The trial court erred in determining that Plaintiffs were the prevailing parties. . . .

2. The trial court erred in awarding Plaintiffs their attorney's fees and costs against Hawaii Superferry pursuant to Haw.Rev.Stat. § 607–25. . . .

3. The trial court erred in awarding Plaintiffs their attorney's fees and costs against Hawaii Superferry pursuant to the private attorney general doctrine. . . .

4. The trial court erred in awarding attorney's fees at the rate of $200 per hour.

5. The trial court erred in awarding costs in the amount of $5,442.44[.]

## III. STANDARDS OF REVIEW

### A. Legislative Enactments

■ This court has long held that:

(1) legislative enactments are presumptively constitutional; (2) a party challenging a statutory scheme has the burden of showing unconstitutionality beyond a reasonable doubt; and (3) the constitutional defect must be clear, manifest, and unmistakable.

*Pray v. Judicial Selection Comm'n*, 75 Haw. 333, 340, 861 P.2d 723, 727 (1993) (internal quotation marks, citations, and brackets omitted) (quoting *Sifagaloa v. Bd. of Trustees of the Employees' Ret. Sys.*, 74 Haw. 181, 191, 840 P.2d 367, 371 (1992)). However, this court has recognized that judicial review of legislative enactments is appropriate, stating that

the legislature's findings are entitled to substantial deference; however, "[A]merican legislatures must adhere to the provisions of a written constitution.... Our ultimate authority is the Constitution; and the courts, not the legislature, are the ultimate interpreters of the Constitution. It is the concept of the Constitution as law, and the judiciary as the institution with responsibility to interpret the law, which remains the cornerstone of judicial review today."

*Convention Ctr. Authority v. Anzai*, 78 Hawai'i 157, 164, 890 P.2d 1197, 1204 (1995) (quoting *State v. Nakata*, 76 Hawai'i 360, 370, 878 P.2d 699, 709 (1994)).

### B. Constitutional Questions

■ "Issues of constitutional interpretation present questions of law that are reviewed *de novo.*" *Blair v. Harris*, 98 Hawai'i 176, 178, 45 P.3d 798, 800 (2002) (citation omitted). In construing the constitution, this court observes the following basic principles:

Because constitutions derive their power and authority from the people who draft and adopt them, we have long recognized that the Hawaii Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional provision is to give effect to that intent. This intent is to be found in the instrument itself.

[T]he general rule is that, if the words used in a constitutional provision are clear and unambiguous, they are to be construed as they are written. In this regard, the settled rule is that in the construction of a constitutional provision the words are presumed to be used in their natural sense unless the context furnishes some ground to control, qualify, or enlarge them.

Moreover, a constitutional provision must be construed in connection with other provisions of the instrument, and also in the light of the circumstances under which it was adopted and the history which preceded it.

*Hanabusa v. Lingle*, 105 Hawai'i 28, 31–32, 93 P.3d 670, 673–74 (2004) (brackets in original) (quoting *Blair v. Harris*, 98 Hawai'i 176, 178–79, 45 P.3d 798, 800–01 (2002)).

### C. Mootness

■ Mootness is a question of law. *See Hamilton ex rel. Lethem v. Lethem*, 119 Hawai'i 1, 4–5, 193 P.3d 839, 842–43 (2008). A trial court's conclusion of law

is not binding upon an appellate court and is freely reviewable for its correctness. This court ordinarily reviews [conclusions of law] under the right/wrong standard. Thus, a [conclusion of law] that is supported by the trial court's findings of fact and that reflects an application of the correct rule of law will not be overturned. However, a [conclusion of law] that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.

*State v. Reis*, 115 Hawai'i 79, 84, 165 P.3d 980, 985 (2007) (internal quotation marks, citations, and original brackets omitted) (quoting *Allstate Ins. Co. v. Ponce*, 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004)).

### D. *Motion to Dissolve Injunction*

 Generally, the granting or denying of injunctive relief rests with the sound discretion of the trial court and the trial court's decision will be sustained absent a showing of a manifest abuse of discretion. Abuse of discretion may be found where the trial court lacked jurisdiction to grant the relief, or where the trial court based its decision on an unsound proposition of law.

*Hawai'i Pub. Employment Relations Bd. v. United Pub. Workers, Local 646, AFSCME, AFL–CIO*, 66 Haw. 461, 467–68, 667 P.2d 783, 788 (1983) (internal citations omitted). Accordingly, a trial court's decision to dissolve an injunction is reviewed for an abuse of discretion.

### E. *Motion to Vacate*

 A circuit court's grant or denial of a motion to vacate is reviewed for abuse of discretion. *Beneficial Hawai'i, Inc. v. Casey*, 98 Hawai'i 159, 164, 45 P.3d 359, 364 (2002).

> The trial court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. Stated differently, an abuse of discretion occurs where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*Id.* (internal quotations omitted) (quoting *Molinar v. Schweizer*, 95 Hawai'i 331, 335, 22 P.3d 978, 982 (2001)).

### F. *Determination of Prevailing Party*

 Our determination of who is the prevailing party involves interpretation of the [Hawai'i Administrative Rules (HAR)] and the (HRCP), both of which are rules promulgated by the court. "When interpreting rules promulgated by the court, principles of statutory construction apply." *Price v. Obayashi Hawaii Corp.*, 81 Hawai'i 171, 176, 914 P.2d 1364, 1369 (1996) (citing *State v. Lau*, 78 Hawai'i 54, 58, 890 P.2d 291, 295 (1995)). "Interpretation of a statute is a question of law which we review *de novo*." *Price*, 81 Hawai'i at 176, 914 P.2d at 1369 (citation omitted). Consequently, we interpret the HAR and the HRCP *de novo*.

*Molinar*, 95 Hawai'i at 334–35, 22 P.3d at 981–82.

### G. *Statutory Interpretation*

 The standard of review for statutory construction is well-established. The interpretation of a statute is a question of law which this court reviews *de novo*. Where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning.

*Liberty Mut. Fire Ins. Co. v. Dennison*, 108 Hawai'i 380, 384, 120 P.3d 1115, 1119 (2005) (internal quotations omitted) (quoting *Labrador v. Liberty Mut. Group*, 103 Hawai'i 206, 211, 81 P.3d 386, 391 (2003)).

### H. *Evidentiary Rulings*

 As a general rule, this court reviews evidentiary rulings for abuse of discretion. *Kealoha v. County of Hawai'i*, 74 Haw. 308, 319, 844 P.2d 670, 676 (1993). However, when there can only be one correct answer to the admissibility question, or when reviewing questions of relevance under [Hawai'i Rules of Evidence (HRE)] Rules 401 and 402, this court applies the right/wrong standard of review.

*Kamaka v. Goodsill Anderson Quinn & Stifel*, 117 Hawai'i 92, 104, 176 P.3d 91, 103 (2008).

### I. *Award of Attorney's Fees and Costs*

 "The trial court's grant or denial of [attorney's] fees and costs is reviewed under the abuse of discretion standard." *Kamaka*, 117 Hawai'i at 105, 176 P.3d at 104 (original brackets and internal quotations omitted) (quoting *Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel*, 113 Hawai'i 251, 266, 151 P.3d 732, 747 (2007)).

## IV. DISCUSSION

### A. *Act 2 Is Unconstitutional Special Legislation*

Our analysis begins, as it must, with the language of the Hawai'i Constitution allegedly violated by Act 2. Article XI, section 5 of the Hawai'i Constitution provides:

*The legislative power over the lands owned by or under the control of the State and its political subdivisions shall be exercised only by general laws,* except in respect to transfers to or for the use of the State, or a political subdivision, or any department or agency thereof.

Haw. Const. art. XI, § 5 (emphases added).

Sierra Club argues that Act 2 is unconstitutional because it exercises legislative power over lands owned by the State with a *special* law. DOT and Superferry argue that Act 2(1) does not exercise legislative power over lands owned by the State, and (2) is a general law as required by Article XI, section 5.

### 1. Act 2 is an exercise of legislative power over state lands.

Sierra Club argues that section 1(d) and section 15 of Act 2 authorized Superferry to use State lands at Kahului Harbor that were subject to the operating agreement voided by the circuit court's October 9, 2007 order. Sierra Club further argues that this specific authorization is an exercise of legislative power over State lands.

DOT and Superferry argue that Act 2 was not an exercise of legislative power over State lands but rather, an authorization for large capacity ferry vessels to operate during and after the environmental review process. They note that the circuit court reached the same conclusion during the November 14, 2007 hearing to dissolve the injunction and vacate the order invalidating the operating agreement.[7]

For the reasons discussed below, we agree with Sierra Club regarding section 15 of Act 2.

### a. *Section 1(d)(4) of Act 2 is not an exercise of legislative power over State lands.*

■ Sierra Club's argument that section 1(d)(4) of Act 2 demonstrates an exercise of legislative power over State lands is unpersuasive. Section 1(d)(4) provides:

**7.** At the hearing, the circuit court stated that "Act 2 does not involve the exercise of legislative power over the lands of the State" and instead "alters the applicability of Chapter 343 of the

The purpose of this Act is to facilitate the establishment of inter-island ferry service and, at the same time, protect Hawaii's fragile environment by clarifying that neither the preparation of an environmental assessment, nor a finding of no significant impact, nor acceptance of an environmental impact statement shall be a condition precedent to, or otherwise be required prior to:

. . .

(4) The appropriation or expenditure of any funds, the use of state lands, the issuance of any permits, or the entering into of any agreements[.]

Act 2, § 1(d)(4) at 6–7.

Section 1(d)(4) attempts to clarify which requirements are *applicable* to the use of State lands for the establishment of an inter-island ferry service. DOT, Superferry, and the circuit court are correct in that this section of Act 2 is an attempt to exercise legislative power over the existing procedural law and not a direct exercise of legislative power over lands owned or controlled by the State.

### b. *Section 15 of Act 2 is an exercise of legislative power over State lands.*

■ Sierra Club's argument that section 15 of Act 2 demonstrates an exercise of legislative power over State lands is more convincing.

Section 15 of Act 2 provides, *inter alia:*

Any state lands previously authorized to be used to facilitate or support the operation of a large capacity ferry vessel, shall be authorized to be used to effectuate the provisions of this Act.

Act 2, § 15 at 20.

DOT and Superferry argue that rather than exercise legislative authority over State lands, section 15 of Act 2 merely ratified the pre-existing operating agreement between DOT and Superferry, which was an exercise of executive authority. We disagree.

Hawaii Revised Statutes and the environmental review process of this state as it relates to large capacity ferry vessels."

On September 7, 2005, DOT and Superferry entered into an operating agreement, which authorized Superferry to use "the Facilities for the purpose of operating an interisland ferry system." The "Facilities" were defined as

the Premises, State Equipment and Roadways, together with the pier areas, the pier backup and support areas, passenger terminal building(s), and all other buildings, structures, fixtures and areas thereon or therein, and any space designated for the exclusive or non-exclusive use of [Superferry], access routes, and equipment that the [State] deems is necessary, after consultation with [Superferry], to accommodate [Superferry's] interisland ferry service operations. The Facilities include non-exclusive rights of ingress to and egress from the Facilities for [Superferry], and its employees, customers, guests, contractors, suppliers, furnishers of services, and invitees in such manner and at locations the [State], after consultation with [Superferry], deems appropriate for [Superferry's] operations. The Facilities include the portion of the [Superferry] Equipment defined as the [Superferry] Modifications and do not include the [Superferry] Equipment other than the [Superferry] Modifications. The [State] reserves the right to approve the inclusion of any area, space, improvement, building, structure, pier, pier area, roadway, or access route as part of the Facilities.

The "Premises" were defined as

the areas in the [State] commercial harbors, located on the islands of Oahu (Honolulu Harbor), Maui (Kahului Harbor) [sic] Kauai (Nawiliwili Harbor) and Hawaii (Kawaihae Harbor), to and from which [Superferry] may conduct its interisland ferry service operations[.]

The operating agreement, therefore, authorized Superferry to use lands under the control of the State, including lands at Kahului harbor.

On October 9, 2007, the circuit court declared the operating agreement void "[a]s it relates to the Kahului Harbor in Kahului, Maui" because "it was not preceded by the requisite [EA] which was a condition precedent to approval of the request and commencement of the proposed action." The operating agreement, as it related to the Kahului harbor lands, was void between October 9, 2007 and November 2, 2007, the date that the governor signed Act 2 into law.

Section 15 of Act 2 reauthorized Superferry to use the lands at Kahului Harbor. The legal authority provided by DOT's exercise of executive power was removed by the circuit court's October 9, 2007 order rendering the operating agreement void as it related to the Kahului Harbor lands. Without the legal authority provided by Act 2 through an exercise of legislative power, the operating agreement would have remained void and unenforceable. Therefore, we hold that Act 2 was an exercise of legislative power over State lands.

### 2. Act 2 is a special law.

 Having determined that Act 2 is an exercise of legislative power over State lands, we now examine the critical issue in this case: whether Act 2 is a general law or a special law.

Sierra Club argues that Act 2 is a special law that violates Article XI, section 5 of the Hawai'i Constitution.[8] In support of this argument, Sierra Club contends that whether a law is special or general should be determined by its "substance and practical operation, rather than on its title, form or phraseology."

In contrast, DOT and Superferry argue that Act 2 is a general law that does not violate any provision of the Hawai'i Constitu-

---

8. Sierra Club also claims that Act 2 violates Article I, section 21, which Sierra Club urges "makes all special legislation unconstitutional." Article I, section 21 provides that: "The power of the State to act in the general welfare shall never be impaired by the making of any irrevocable grant of special privileges or immunities." Haw. Const. art. I, § 21.

Unlike Article XI, section 5, Article I, section 21 does not explicitly require the use of a "general law." Sierra Club does not specify how the use of something other than a "general law" violates Article I, section 21. Accordingly, we do not address this argument, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(7).

tion. They argue that the correct test for a general law is whether it creates a rationally based classification and whether the law applies to all members of the class created. For the following reasons, we agree with Sierra Club.

### a. *Interpretation of the term "general law" in Hawai'i is limited.*

Article XI, section 5 of Hawai'i's Constitution provides, in relevant part:

[t]he legislative power over the lands owned by or under the control of the State and its political subdivisions shall be exercised *only by general laws*[.]

Haw. Const. art. XI, § 5 (emphasis added).

Several other provisions of Hawai'i's Constitution also require the use of "general laws." *See, e.g.,* Haw. Const. art. V, § 5 (requiring a "general law" to authorize the governor to grant pardons); art. VII, § 12 (requiring a "general law" to authorize political subdivisions to issue bonds); art. VIII, § 1 (requiring a "general law" to confer powers on political subdivisions); art. VIII, § 2 (requiring a "general law" to set limits and procedures on the power political subdivisions have to frame and adopt a charter); art. IX, § 6 (requiring the State and its political subdivisions to plan and manage the growth of the population by "general law"); art. XVI, § 3.5 (requiring a "general law" to decrease the salary of an officer of the State during a term of office); art. XVIII, § 6 (providing that a "general law" establish default policies and methods of real property tax assessment if not provided by ordinance).

The meaning of a "general law" as used in these constitutional provisions has been interpreted by this court on only one prior occasion: in *Bulgo v. County of Maui,* 50 Haw. 51, 430 P.2d 321 (1967). In *Bulgo,* this court addressed whether a newly enacted statute, which included specific facts that affected only Maui County at the time of enactment, was a special law in violation of Article VII, section 1 of the Hawai'i Constitution. *Id.* at 57–59, 430 P.2d at 325–27.

### i. Under *Bulgo,* a general law must apply uniformly.

At the time of the lawsuit in *Bulgo,* Article VII, section 1 provided that: "Each political subdivision shall have and exercise such powers as shall be conferred under general laws." *Id.* at 54, 430 P.2d at 324. The plaintiff in *Bulgo* argued that Act 47 of the Session Laws of 1967 was a special law because one of its provisions could not possibly apply to any county other than Maui. *Id.* at 57, 430 P.2d at 326.

Act 47 provided, in relevant part:

SECTION 1. Chapter 138 of the Revised Laws of Hawaii 1955 is amended by adding a new section as follows:

"Section 138-_____. Special elections. If a person elected in a general election to the office of chairman of the board of supervisors of a county dies before January 2 following his election, the governor shall issue a proclamation within ten days after the occurrence of the death requiring special elections to be held to fill the vacancy so created. The proclamation shall provide that a primary election be held within sixty days after, but no sooner than forty-five days after, the occurrence of the death to nominate candidates for a general election to be held thirty days after the primary election. The governor shall issue a proclamation within ten days after the approval of this Act requiring special elections to be held if any person elected in the general election of 1966 to the office of chairman of the board of supervisors of a county died before January 2, 1967, and such proclamation shall provide that a primary election be held within sixty days after, but no sooner than forty-five days, after the approval of this Act to nominate candidates for a general election to be held thirty days after the primary election. In any case, the tenure of any holdover or temporary chairman then serving shall terminate when the successor chairman shall be so elected in a general election and qualified. If any special election is held in the county within one hundred and twenty days after, but no sooner than forty-five days, after the occurrence of the death or approval of this Act, as the case may be,

then such special election shall be held in conjunction with the general election provided by this Act.

. . .

SECTION 2. This Act shall apply to each county in the State unless a county adopts a charter which provides for succession of the office of chairman of the board of supervisors under the contingency covered by this Act.

. . .

SECTION 5. This Act shall take effect upon its approval.

1967 Haw. Sess. Laws Act 47 at 34–35.

The plaintiff in *Bulgo* challenged the following provision in Act 47:

The governor shall issue a proclamation within ten days after the approval of this Act requiring special elections to be held if any person elected in the general election of 1966 to the office of chairman of the board of supervisors of a county died before January 2, 1967, and such proclamation shall provide that a primary election be held within sixty days after, but no sooner than forty-five days, after the approval of this Act to nominate candidates for a general election to be held thirty days after the primary election.

*Bulgo*, 50 Haw. at 53, 430 P.2d at 323. As alleged by the plaintiff in *Bulgo*, and as observed by this court, "[a]t the time of approval of the Act, the county of Maui was the only county in which the person elected as county chairman in the 1966 general election had died before January 2, 1967." *Id.* at 54, 430 P.2d at 324.

In interpreting Article VII, section 1, this court determined that the constitutional language was not vague and that it required "the legislature to confer powers upon the counties only by general laws." *Id.* at 58, 430 P.2d at 326. The determinative question was "whether the provision constitutes a general law or a special law." *Id.*

In the context of Article VII, section 1, this court defined "general laws" as "laws which apply uniformly throughout all political subdivisions of the State." *Id.* The court noted, however, that "a law may apply to less than all of the political subdivisions and still be a

general law, if it applies uniformly to a class of political subdivisions, which, considering the purpose of the legislation, are distinguished by sufficiently significant characteristics to make them a class by themselves." *Id.*

### ii. The act considered by *Bulgo* granted a power uniformly by general law.

Relying on the unchallenged portion of section 1 in Act 47, this court determined that Act 47 applied to "a class of political subdivisions consisting of every county other than a county which adopts a charter providing for succession to the office of county chairman when a chairman-elect dies before January 2 following his election." *Id.*

The *Bulgo* court noted that under Article VII, section 1, "the thing that is required to have uniform application is the power given to, and exercised by, political subdivisions." *Id.* at 59, 430 P.2d at 326. The court further observed that

[t]he power given by Act 47 is the power to hold special elections for successor county chairman [sic] where the chairman-elect dies before January 2 following his election. The Act confers this power upon every county in which the contingency occurs so long as the county is within the class of political subdivisions encompassed by it.

The Act provides for the timing of the special elections in three different situations. The challenged provision covers one situation. Such timing provision does not confer any power and relates only to the exercise of the power that has been granted.

*Id.*

The *Bulgo* court concluded that Act 47, including the challenged provision, was a general law because

[t]he challenged provision does not give the county of Maui any power which is different from that which the Act gives to the counties of Hawaii and Kauai. It neither favors nor discriminates against Maui. The contingency contemplated in the Act now exists on Maui. The provision brings

Maui within the scope of the Act in the present situation.

*Id.* at 59, 430 P.2d at 327.

### iii. *Bulgo* is limited in its applicability to this case.

*Bulgo* is distinguishable from this case in two significant ways. First, Act 47 conferred a power to "each county in the State" unless a county had adopted a charter that provided an alternate process for addressing the situation described in Act 47. Act 47, § 2 at 35. At least two other counties existed when Act 47 was enacted, and they also received the power conferred by the Act at the time of its enactment. *See id.* at 59, 430 P.2d at 327.

In this case, only one member of the class created by Act 2 existed at the time of its enactment. Section 2 of Act 2 provides the following definitions:

"Large capacity ferry vessel" means any inter-island ferry vessel that transports, is designed to transport, or is intended to transport per voyage at least five hundred passengers, two hundred motor vehicles, and cargo between the islands of the state.

"Large capacity ferry vessel company" means any company that owns or operates a large capacity ferry vessel.

Act 2, § 2 at 7. Unlike *Bulgo*, in this case there is no evidence in the record that any company, other than Superferry, met the definition provided by section 2 when Act 2 was enacted.

Secondly, the *Bulgo* court did not contemplate a statute that was subject to automatic repeal on a particular date or upon the happening of a one-time event. *Compare* Act 47 at 34–35 *with* Act 2, § 18 at 20–21. Section 18 of Act 2 mandates such a repeal. Section 18 provides:

This Act shall take effect upon its approval; provided that *this Act shall be repealed on the earlier of:*

(1) *The forty-fifth day, excluding Saturdays, Sundays, and holidays, following adjournment sine die of the regular session of 2009; or*

(2) *Upon acceptance of the final environmental impact statement as provided in this Act;* and

provided further that:

(1) The final environmental impact statement by the department of transportation that is accepted by the office of environmental quality control under this Act shall be and remain effective for all purposes under the laws of this state, notwithstanding the repeal of this Act; and (2) Section 16 of this Act shall not be repealed when this Act is repealed.[9]

Act 2, § 18 at 20–21 (emphasis added).

In contrast, the *Bulgo* court considered an Act that was unlimited in duration. As such, it was possible that future circumstances would require another county to exercise the power conferred by Act 47. Such a possibility is highly unlikely, if not impossible, in this case. The rights and privileges conferred to "a large capacity ferry vessel company" by Act 2 exist for a limited period of time (less than twenty-one months) and the possibility

---

9. Section 16 of Act 2 provides:

Every large capacity ferry vessel company that has the legal right to operate pursuant to section 3 of this Act, during the time period this Act is effective, by exercising such right to operate at any time this Act is effective, by such operation, releases and waives any and all claims that have accrued or arisen as of the effective date of this Act for damages or other judicial relief it or any of its agents, successors, and assigns might otherwise have or assert against the State of Hawaii, its agencies, and its officers and employees, in both their official and individual capacities, that have or may have been caused by or are related in any way to:

(1) The need, requirement, preparation, non-preparation, acceptance, or lack of ac-

ceptance of or for any environmental assessments or environmental impact statements; or

(2) Any judicial action regarding the establishment and operation of the large capacity ferry vessel in the state,

and such large capacity ferry vessel company by such operation accepts the obligation to, and thus shall indemnify and defend the State of Hawaii, its agencies, and its officers and employees, in both their official and individual capacities, from such claims brought by, through, or under the large capacity ferry vessel company, or any of its agents, successors, and assigns.

Act 2, § 16 at 20.

that a company other than Superferry would be able to exercise those same rights before they are extinguished is beyond remote. *See infra* Part IV.A.2.c.ii.

Thus, while *Bulgo* informs our approach to distinguishing between general and special laws, it is limited in its application, as the *Bulgo* court did not consider a statute that created a class with only one member nor did it consider a statute that was limited in duration.

Therefore, we look to the case law of other jurisdictions. After reviewing other approaches to distinguishing between special and general laws, we believe that guidance on this issue is best found in the Colorado Supreme Court's approach in *People v. Canister*, 110 P.3d 380 (Colo.2005). The Nebraska Supreme Court and Arizona Supreme Court provide further guidance in analyzing the future applicability of a class. *See Haman v. Marsh*, 237 Neb. 699, 467 N.W.2d 836, 848–49 (1991); *Republic Inv. Fund I v. Town of Surprise*, 166 Ariz. 143, 800 P.2d 1251, 1258–59 (1990).

### b. *Under Canister, general laws cannot create an illusory class.*

In *Canister*, the governor of Colorado called a special legislative session to consider legislation that would amend Colorado's capital punishment sentencing procedure to conform with the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which concluded that a capital sentencing statute similar to Colorado's was an unconstitutional violation of the Sixth Amendment right to a jury trial. *Canister*, 110 P.3d at 381. The Colorado legislature drafted and approved a bill that would apply to cases where the prosecution had announced it would seek a death sentence but a sentencing hearing had not yet been held. *Id.* at 381–82. At the time the law was enacted, the law was applicable to only two people, Randy Deon Canister and Abraham Hagos. *Id.*

At the time of Canister's trial, Colorado's sentencing procedures provided that if a defendant was convicted of a crime eligible for the death penalty, a three-judge panel would determine whether the defendant would be sentenced to death or life imprisonment. *Id.* at 381. While Canister's trial was in progress, the United States Supreme Court announced its decision in *Ring*. *Id.* The Colorado legislature responded with a bill that "abolish[ed] the three judge panel and return[ed] responsibility for the capital sentencing determination to the jury that heard the guilt phase." *Id.* Canister challenged the following provision of the bill, *inter alia*, as special legislation:

> *If, as of July 12, 2002*, the prosecution has announced it will be seeking the death sentence as the punishment for a conviction of a class 1 felony and a defendant has been convicted at trial of a class 1 felony or has pled guilty to a class 1 felony, but a sentencing hearing to determine whether the defendant shall be sentenced to death or life imprisonment has not yet been held, a jury shall be impaneled to determine the sentence at the sentencing hearing pursuant to the procedures set forth in this section or, *if the defendant pled guilty or waived the right to a jury sentencing, the sentence shall be determined by the trial judge.*

*Id.* at 381–82 (emphases added). Canister argued that the State was precluded from seeking the death penalty against him because the challenged provision of the new statute was unconstitutional. *Id.* at 382. The trial court found that the provision "violated constitutional prohibitions against special legislation, bills of attainder and … ex post facto laws." *Id.* at 382. The Colorado Supreme Court upheld the trial court's ruling on the basis that the challenged provision was unconstitutional special legislation. *Id.* at 385–86.

### i. *Canister* provides a two-step analysis for special legislation.

The Colorado Supreme Court outlined a two-step analysis to determine whether laws that implicate "one of the express prohibitions enumerated in the constitutional provision" are special or general. *Id.* at 383. The first step required the court to determine "whether the classification adopted by the legislature is a real or potential class, or whether it is logically and factually limited to

a class of one and thus illusory." *Id.* (quoting *In re Interrogatory Propounded by Governor Roy Romer on House Bill 91S–1005*, 814 P.2d 875, 886 (Colo.1991) (hereinafter "*Interrogatory* ")) (internal quotations omitted). If the law created an illusory class it was prohibited special legislation. *Id.* If the law created a genuine class, the second step of the analysis required the court to determine whether the class was reasonable. *Id.*

### ii. Genuine classes have the potential for future applicability.

In applying this analysis to the challenged statute, the *Canister* court determined that the statute created an illusory class and was prohibited special legislation. *Id.* at 385. In determining whether the statute created a "real or illusory class[,]" the court reviewed several Colorado cases that had concluded the legislation at issue created genuine classes. *Id.* at 383. The *Canister* court observed that a common characteristic of those cases was the "[p]otential future applicability" of the challenged statutes. *Id.* at 384; *see also Darrow v. People ex. rel Norris*, 8 Colo. 417, 8 P. 661 (1885) (determining that a statute creating a superior court in a town or city with 25,000 inhabitants was not special legislation despite it only applying to Denver at the time of enactment, because the legislature clearly intended that it apply to other towns and cities in the future, and the statute was "unlimited as to time in its operation"); *Interrogatory*, 814 P.2d 875 (determining that a statute providing incentives to encourage United Airlines to construct and operate a maintenance facility in Colorado did not create an illusory class because it contained no time limit and another aviation-related business could meet the statutory criteria in the future and receive the same benefits provided by the statute); *Am. Water Dev., Inc. v. City of Alamosa*, 874 P.2d 352 (Colo.1994) (determining that Colorado's natural surface stream legislation was not special legislation despite only applying to two stream systems at the time of enactment because it had "an indefinite period of application" and it may be found to apply to other streams in the future); *City of Greenwood Village v. Petitioners for the Proposed City of Centennial*, 3 P.3d 427 (Colo.2000) (determining that a statute that held an annexation proceeding in abeyance pending a conflicting incorporation proceeding, which involved a proposed city of over 75,000 inhabitants, was not unconstitutional special legislation because it was "generic in its application, [was] applicable to other foreseeable situations, [and did] not deal with a class of one").

### iii. The "Glendale Bill" lacked potential future applicability and created an illusory class.

The *Canister* court then observed that "[o]ur special legislation precedent illustrates that, even when the legislature had a specific entity in mind when drafting the legislation, the class created by the legislation is not illusory if it could include other members in the future." *Canister*, 110 P.3d at 384. The court further noted that "[b]y contrast, a class that is drawn so that it will never have any members other than those targeted by the legislation is illusory, and the legislation creating such a class is unconstitutional special legislation." *Id.*

Such a class was considered in *In re Senate Bill No. 95 of the Forty–Third General Assembly*, 146 Colo. 233, 361 P.2d 350 (1961). In that case, the Colorado legislature passed an annexation bill that the Colorado Supreme Court determined could only apply to the annexation of the town of Glendale by the city of Denver. *Id.* at 353. The challenged bill, widely referred to as "The Glendale Bill," provided in relevant part:

> Whenever any town existing under the general laws of this state contains less than six hundred and forty acres in area and shall have been surrounded for a period of not less than five years by a city or city and county, the territory included within such surrounded town shall become a part of the surrounding city or city and county and such surrounded town may be annexed to and become a part of the surrounding city or city and county by appropriate ordinance passed by the city council of the annexing city or city and county without complying with any of the other provisions of this article. Annexation shall be complete on the effective date of the annexation ordinance for all purposes ex-

cept that of general taxation in which respect annexation shall not become effective until on and after the first day of January, next ensuing.

*Id.* at 351–52 (internal quotations omitted) (quoting Senate Bill No. 95). The bill also included a repealing clause, which provided that "[t]he provisions of this act are hereby specifically repealed on and after July 1, 1962." *Id.* at 352.

At the request of the governor, the Colorado Supreme Court reviewed the bill to determine if it was a special law in violation of the Colorado Constitution. *Id.* at 353. The court's review concluded that the bill was conclusively shown to be a special law based on two facts: (1) the bill applied only to 640–acre surrounded towns and not 640–acre surrounded cities, and (2) the repealing clause made it "absolutely certain that the bill can apply only to a town now in existence and meeting the very special requirements of being less than 640 acres in extent and being completely surrounded by a special charter town or city." *Id.* at 353–54. The court further determined that the bill could not operate prospectively because it was "impossible that before July 1, 1962, any circumstance [could] occur to allow another town to be surrounded for five years by a special charter town or city." *Id.* at 354.

The court concluded that

Senate Bill No. 95 was unquestionably conceived, cut, tailored and amended to accomplish a particular purpose with reference to a particular area, to-wit, Glendale. Once having accomplished that particular purpose the act would die before it could possibly accomplish a like purpose in any other place.

*Id.*

Based on this precedent, the *Canister* court determined that this description applied equally to the capital sentencing statute challenged in that case. *Canister,* 110 P.3d at 384. The court explained:

[a]s of July 12, 2002, the date the statutory class created by section 18–1.4–102(1)(e) closed, as well as the date the statute became effective, Canister and Hagos were the only two people in Colorado for whom

the prosecution had announced it was seeking the death sentence, who had been convicted at trial of a class 1 felony, and for whom a sentencing hearing had not yet been held....

Because of the time limitation built into the section, Canister and Hagos are the only two people to whom it will ever apply. Like the legislation in *Senate Bill No. 95,* section 18–1.4–102(1)(e) cannot operate prospectively, and will have no future effect after accomplishing its purpose of making the death penalty available as punishment for Canister and Hagos.

*Id.* at 385. The *Canister* court concluded that the challenged provision was a violation of Colorado's constitutional prohibition against special legislation, stating that "[b]ecause those two people are the only individuals to whom the statute will ever apply, the classification adopted by the legislature is logically and factually limited to a 'class of one,' and thus is illusory." *Id.* at 385.

### iv. The actual probability that a law will apply in the future must be considered.

Like the Colorado Supreme Court in *Canister,* other courts have also emphasized future applicability as a determining factor in special legislation analysis, and they provide guidance for evaluating the likelihood of that future application. *See Haman v. Marsh,* 467 N.W.2d at 848–49; *Town of Surprise,* 800 P.2d at 1258–59.

In *Haman v. Marsh,* the Supreme Court of Nebraska determined that a law that would pay $33.8 million of state tax money to depositors affected by the failure of industrial loan and investment companies in Nebraska was a special law. 467 N.W.2d at 841. In evaluating whether the challenged law created a permanently closed class, the Nebraska Supreme Court stated that "a classification which limits the application of the law to a present condition, and leaves no room or opportunity for an increase in the numbers of the class by future growth or development, is special[.]" *Id.* at 848. The Nebraska court also concluded that it was not limited to the face of the legislation to determine whether the class was closed, but could consider the

act's application. *Id.* at 849. The court stated

> [i]n deciding whether a statute legitimately classifies, the court must consider the *actual probability* that others will come under the act's operation. If the prospect is merely theoretical, and not probable, the act is special legislation. The conditions of entry into the class must not only be possible, but reasonably probable of attainment.

*Id.* (emphasis added) (citing *Town of Surprise,* 800 P.2d 1251). The Nebraska court noted the plaintiff's description of the improbable "sequence of events" required for entry into the class created by the challenged statute:

> First new industrials would have to be chartered. Second, they would have to become members of the [Nebraska Depository Institution Guaranty Corporation (NDIGC)] (or the only two industrials which presently exist would have to renounce their [Federal Deposit Insurance Corporation (FDIC)] coverage and become members of the NDIGC), and the deposits of those industrials would have to be guaranteed by the NDIGC. Third, those industrials would have to go into receivership or bankruptcy. And, fourth, the depositors of those institutions would have to suffer deposit losses.

*Id.* at 848–49. The Nebraska court determined that "except for a highly improbable set of events the class [was] permanently closed to future members" and that "[t]o force the plaintiff to disprove every possible contingency would be to accept artful draftmanship over reality." *Id.* at 849.

Similarly, in *Town of Surprise,* the Supreme Court of Arizona concluded that a deannexation statute that applied to "a city or town having a population of less than ten thousand persons according to the 1980 United States decennial census within a county having a population in excess of one million two hundred thousand persons according to the 1980 United States decennial census" was a special law that created a class that could not include future members. 800 P.2d at 1255 (emphasis removed). The Arizona court stated that "[t]o decide whether a statute legitimately classifies, we will consider the *actual probability* that others will come under the act's operation when the population changes. Where the prospect is only theoretical, and not probable, we will find the act special or local in nature." *Id.* at 1259 (emphasis added). On the issue of future applicability of the challenged statute, the court found that "the statute's focus, limited to a particular census for only 13 months, prevents any municipality from either coming within or exiting from its operation in the future." *Id.*

These cases teach that in determining whether a law creates an illusory class depends not only on whether others may theoretically enter the class, but on the "actual probability" that others will enter the class in the future. *See Haman v. Marsh,* 467 N.W.2d at 848–49; *Town of Surprise,* 800 P.2d at 1258–59.

### c. *Act 2 creates an illusory class.*

Applying the foregoing analysis to the facts of this case, we conclude that Act 2 creates a class that is "logically and factually limited to a 'class of one'" and is, therefore, illusory. *See Canister,* 110 P.3d at 385.

Section 1(b) of Act 2 provides:

This Act adopts a new policy, and further clarifies and amends existing law, with respect to this new type of inter-island ferry service to provide that, during the period in which any required environmental review and studies, including environmental assessments or environmental impact statements, are prepared, and also following their completion:

(1) *A large capacity ferry vessel company* and large capacity ferry vessels may operate subject to the employment of measures to mitigate significant environmental effects;

(2) Agreements with respect to the operations of a large capacity ferry vessel company, including a large capacity ferry vessel company operating agreement, entered into between the State and a large capacity ferry vessel company, may be enforced as written or as executed or re-executed; and

(3) Related harbor improvements may be constructed and used by the State, by a large capacity ferry vessel company, and by others,

notwithstanding the fact that the non-preparation or non-completion of environmental assessments or environmental impact statements, the lack of acceptance of an environmental impact statement, or the lack of a finding of no significant impact, would otherwise have barred, delayed, been a condition precedent to, or interfered with paragraphs (1) through (3).

Act 2, § 1(b) at 6 (emphasis added). Section 1(b)(1) provides that the class of "[a] large capacity ferry vessel company" will be treated differently under the law pursuant to Act 2, most importantly, being once-again exempt from the requirements of HRS chapter 343. *Id.*

For this class to be considered genuine, it must be reasonably probable that other members could enter the class in the future. *See Canister,* 110 P.3d at 384; *Haman v. Marsh,* 467 N.W.2d at 848–49; *Town of Surprise,* 800 P.2d at 1258–59. Such a conclusion is prevented by Act 2's repealing provision. *See* Act 2, § 18 at 20–21.

### i. Act 2's maximum viability of twenty-one months realistically limited the benefits of Act 2 to Superferry.

Section 18 of Act 2 provides, in relevant part:

This Act shall take effect upon its approval; provided that this Act shall be repealed on the earlier of:

(1) The forty-fifth day, excluding Saturdays, Sundays, and holidays, following adjournment sine die of the regular session of 2009; or

(2) Upon acceptance of the final environmental impact statement as provided in this Act[.]

Act 2, § 18 at 20.

Article III, section 10 of the Hawai'i Constitution provides, in relevant part:

The legislature shall convene annually in regular session at 10:00 o'clock a.m. on the third Wednesday in January.

. . .

Regular sessions shall be limited to a period of sixty days. . . . Any session may be extended a total of not more than fifteen days.

. . .

Each regular session shall be recessed for not less than five days at some period between the twentieth and fortieth days of the regular session. . . . Saturdays, Sundays, holidays, the days in mandatory recess and any days in recess pursuant to a concurrent resolution shall be excluded in computing the number of days of any session.

Haw. Const. art. III, § 10.

The third Wednesday in January 2009 is January 21st. The regular session of 2009 must end within seventy-five days (excluding at least five mandatory recess days, Saturdays, Sundays, and holidays). Accordingly, sine die of the 2009 regular session will occur in approximately mid-May. Forty-five days (excluding Saturdays, Sundays, and holidays) following adjournment sine die will occur no later than the end of July. Thus, by its own language Act 2 will be repealed no later than July 31, 2009.

Act 2 was enacted on November 2, 2007, and it will be repealed upon acceptance of the final environmental impact statement as provided in Act 2, or July 31, 2009, whichever occurs earlier. Consequently, Act 2 is viable for a maximum of twenty-one months.

Any "new" company seeking to qualify under Act 2 would have to build or acquire a vessel that "transports, is designed to transport, or is intended to transport per voyage at least five hundred passengers, two hundred motor vehicles, and cargo between the islands of the state." Act 2, § 2 at 7. This new company would only be granted the right to operate and utilize State harbor improvements and facilities under Act 2 if it did so "pursuant to and subject to" agreements and contracts with State entities "relating to the operation of a large capacity ferry vessel and the use of state harbor facilities." Act 2, § 3(1) at 8. The company would also have to "comply with all laws of general applicability,

except as otherwise provided in this Act." Act 2, § 5 at 10.

Accordingly, any potential new class member under Act 2 would have no more than twenty-one months to build or acquire a qualifying vessel, enter into a qualifying agreement or contract with the State, and comply with all relevant federal and State requirements for operating a passenger service over water before it could attempt to benefit from Act 2.

As discussed further below, Act 2's limited viability period of a maximum of twenty-one months effectively limited its benefits to Superferry, as no other large capacity ferry vessel company could realistically enter the market and compete with Superferry during this abbreviated time frame.

### ii. Superferry's experience illustrates that no other company could enter the market in twenty-one months.

Superferry indicated in its July 22, 2004 application to the Public Utilities Commission for a Certificate of Public Convenience and Necessity (CPCN) that it was "not aware of any competing utilities providing similar service in the state of Hawaii, i.e., a roll-on/roll-off fast passenger ferry." As Superferry is the current and sole operator of this unique service in Hawai'i, we look to its experience as an example of: (1) the requirements that future ferry operators seeking to enter the

class created by Act 2 would likely have to meet and (2) the time necessary to meet those requirements.

Superferry's vessel which meets Act 2's transportation requirements (five hundred passengers, two hundred motor vehicles, and cargo) was built for Superferry. Construction of this vessel took approximately three years, as construction began in May 2004 and the vessel was delivered in or around July 2007. To finance the construction, Superferry applied for and received guarantees of 78% of the actual vessel construction costs from the Maritime Administration of the United States Department of Transportation under its Title XI ship financing program. For the remainder of the financing, Superferry arranged a loan from its shipbuilder, Austal USA, for 10% of the value of the shipyard contract, and expected to sell $58.3 million in preferred stocks. As a condition of financing, the Maritime Administration and Superferry's equity investors required a commitment from the State that it would build the harbor facilities necessary to accommodate the new ferry service. This commitment was confirmed on September 7, 2005 and the Maritime Administration financing closed on October 25, 2005.

Prior to operating its new vessel, Superferry was required to: (1) enter an agreement with the State to use State harbor facilities, (2) construct passenger accommodations at all harbors excluding Honolulu, (3) secure various types of insurance,[10] (4) provide the

---

**10.** The operating agreement between Superferry and the State required Superferry to secure insurance for: (1) its construction and installation of equipment at the State harbors; (2) its operations; (3) business interruption; and (4) all motor vehicles owned, leased, or hired by Superferry. The operating agreement required that the operations insurance be in full force and effect no later than thirty days prior to the date service commenced with Superferry's first ship.

Six types of insurance were required for the construction and installation of equipment: (1) commercial general liability insurance or marine general liability insurance (with combined single limit coverage of not less than $1,000,000 per person and per occurrence arising from any one accident or other cause); (2) property damage liability insurance (with combined single limit coverage of not less than $1,000,000 per occurrence); (3) workers' compensation and employer's liability insurance (not less than $100,000); (4) owner's and contractor's protective public

liability and protective property damage insurance (with combined single limit coverage of not less than $1,000,000 per occurrence); (5) builder's risk insurance (with combined single limit coverage of not less than $250,000 per occurrence); and (6) accidental petroleum release (with combined single limit coverage of not less than $1,000,000 per occurrence).

Five types of insurance were required to cover operations: (1) commercial general liability insurance or marine general liability insurance (with combined single limit coverage of not less than $5,000,000 per occurrence); (2) property damage liability insurance (with combined single limit coverage of not less than $5,000,000 per occurrence); (3) workers' compensation and employer's liability insurance (not less than $100,000); (4) fire and extended coverage insurance for other hazards and perils; and (5) accidental petroleum release insurance (with combined single limit coverage of not less than $2,000,000 per occurrence).

State with a performance bond and a third preferred mortgage on each vessel,[11] (5) contract a marine management and crewing service, (6) apply for any relevant federal permits required to operate the ferry service, and (7) receive State approval of an operating schedule of arrival and departure times for each vessel at and from State harbors 90 days prior to commencing service.

Superferry entered an operating agreement with the State on September 7, 2005,[12] approximately twenty-three months prior to commencing its commercial operations on August 26, 2007. The operating agreement was conditioned on Superferry receiving: (1) a CPCN from the Public Utilities Commission, (2) a certificate of inspection from the United States Coast Guard, and (3) evidence that the Superferry's vessels met the classification requirements of an independent classification society.

In the operating agreement, Superferry and the State agreed that the construction of certain structures were required at the State harbors to accommodate the operation of Superferry's vessels. Some of these structures would be built by the State and others would be built by Superferry.

The agreement acknowledged that "the [State] does not have passenger accommodations at the Facilities [13] other than Honolulu." As such, the operating agreement allowed Superferry to "construct, install, and use the [Superferry] Equipment for passenger accommodations and to accommodate [Superferry] security, vehicle and agricultural inspection, and other personnel at those Facilities."

"[Superferry] Equipment" was defined in the agreement as:

(1) Gangways (to the extent not provided by the [State] pursuant to Section IV.D.2), (2) furnishings, fixtures, and equipment purchased, constructed, or installed by [Superferry] at the Facilities, (3) tents for passenger accommodations (at all Facilities other than Honolulu), (4) tents for security, vehicle and agricultural inspection, and other personnel, (5) furnishings for the passenger accommodation areas, (6) portable restroom facilities (at all Facilities other than Honolulu), (7) minor improvements to existing Facilities, including, without limitation, booths, structures, and security, screening, and inspection devices or equipment, (8) utility service and connections (such as water, sewer, power, fire protection, electrical, and lighting) and all associated infrastructure and appurtenances, (9) security fencing and gates, (10) pavement and pavement striping, (11) infrastructure upgrades, signage, lighting, and public address and communication systems, (12) parking areas, storage areas, and other modified areas within the Facilities that will be used by [Superferry], (13) any other items described more particularly in Section VI.A.2.,[14] and (14) all substitutions,

---

11. Superferry was required to post an annual performance bond with the State of not less than $750,000. As additional security for Superferry's performance under the operating agreement, Superferry was required to grant the State a "third preferred ship mortgage on each vessel delivered" to Superferry.

12. The agreement was later amended on October 25, 2005.

13. As noted previously, "Facilities" was defined in the operating agreement as

the Premises, State Equipment and Roadways, together with the pier areas, the pier backup and support areas, passenger terminal building(s), and all other buildings, structures, fixtures and areas thereon or therein, and any space designated for the exclusive or non-exclusive use of [Superferry], access routes, and equipment that the [State] deems is necessary, after consultation with [Superferry], to accommodate [Superferry's] interisland ferry service operations. The Facilities include non-exclusive rights of ingress to and egress from the Facilities for [Superferry], and its employees, customers, guests, contractors, suppliers, furnishers of services, and invitees in such manner and at locations the [State], after consultation with [Superferry], deems appropriate for [Superferry's] operations. The Facilities include the portion of the [Superferry] Equipment defined as the [Superferry] Modifications and do not include the [Superferry] Equipment other than the [Superferry] Modifications. The [State] reserves the right to approve the inclusion of any area, space, improvement, building, structure, pier, pier area, roadway, or access route as part of the Facilities.

14. Section VI.A.2. provided that

[t]he [Superferry] Equipment includes all accommodations for passenger processing, service, inspection, assembly, and waiting, shel-

replacements, modifications and alterations thereto.

The agreement further stated that

*All [Superferry] Equipment shall be owned or controlled by [Superferry] and shall be for [Superferry's] exclusive use, except for the [Superferry] Modifications.*[15] The [Superferry] Equipment shall include the [Superferry] Modifications. To the extent that any of the items listed in this Section I.V. as [Superferry] Equipment are provided by the [State] pursuant to Sections IV.D.2. or IV.D.3., the items so provided by the [State] shall be considered State Equipment and not [Superferry] Equipment or [Superferry] Modifications. (Emphasis added.)

The operating agreement between Superferry and the State acknowledged that other ferry operators might enter the market during the term of the agreement and that

[s]hould such situation arise, the [State] may make available to such other ferry operators, *subject to the Schedule (to the extent permitted by law), use and access to Facilities subject to agreements containing general terms and conditions similar to that contained in this Agreement* or with such revisions, updates, or modifications as the [State] deems necessary to meet specific conditions or circumstances that may prevail or occur at the time of the commencement of such additional, new, or competing ferry service operations.

(Emphasis added.) The agreement later stated, however, that "if or when a new ferry service operator desires to commence service, ... *the [State] may not be able to provide similar space to such other operator for its passenger accommodations.*" (Emphasis added.) In that event, Superferry would be required to provide the new ferry

service operator with "a reasonable opportunity to work out a sharing arrangement with [Superferry] for the use of the *[Superferry] Modifications* at a fair rent or charge for such use." (Emphasis added.) However, Superferry "[would] not be obligated to share *[Superferry] Equipment*, other than [Superferry] Modifications." (Emphasis added.)

The installations planned for Kahului Harbor, including the passenger terminal and gangways, would be considered "[Superferry] Equipment" under Superferry's operating agreement with the State. If the State could not provide similar space to future ferry service operators for their own passenger accommodations, and Superferry would not be obligated to share its passenger accommodations, it is unclear how other ferry service operators would realistically operate at Kahului Harbor.

Assuming, however, that the State was able to provide other ferry service operators with sufficient space to construct their own passenger accommodations at the neighbor island harbors, those service operators would ostensibly be subject to requirements similar to those imposed on Superferry. Prior to constructing passenger accommodations at any harbor, the operating agreement between Superferry and the State required Superferry to: (1) obtain the State's written approval of Superferry's equipment plans; (2) obtain all necessary permits and governmental approvals for Superferry's construction plans; and (3) obtain the State's written approval of Superferry's construction plans. Prior to use of these accommodations, Superferry was required to: (1) provide the State with detailed port facility and vessel security plans that had been approved by the United States Department of Homeland Security and (2) obtain the State's approval of Superferry's operational plans [16] for each harbor at "35%, 70% and 100% levels of development."

---

ter, tents, restroom facilities, seating, interior directional signage, baggage and vehicle assembly and collection, inspection and security screening, shelter (tents) for security and [Superferry] personnel together with any devices needed or deemed necessary to enable the safe movement of vehicles and passengers to, from, onto, or off the [Superferry's] ferry vessels at the Facilities other than the State Equipment.

15. "[Superferry] Modifications" are defined as "that portion of the [Superferry] Equipment that

is placed, constructed, or installed on a portion of the Facilities not set aside for [Superferry's] exclusive use and cannot be separated or moved, such as pavement, pavement marking, lighting, fencing and gates, and upgrades on existing structures. The [Superferry] Modifications are not for [Superferry's] exclusive use."

16. Operational plans were required to be a single, comprehensive document that covered all aspects of Superferry's operations, including: (1) schedules and scheduling process; (2) check in

Assuming that other ferry service operators, after meeting similar requirements, were allowed to construct their own passenger accommodations, those operators would need to utilize any facilities built by the State to accommodate ferry service operations at State harbors.

Pursuant to the operating agreement between Superferry and the State, any structures built by the State to accommodate the new ferry service would be owned by the State and theoretically available for use by other operators. This equipment included barges and ramps necessary for the vessels to load and unload vehicles. When the State constructed this equipment, however, only Superferry's vessel design and specifications were available for the State to consult. Moreover, the operating agreement acknowledged that the State "require[d] specific information on the design and operation of [Superferry's] ferry vessels in order to properly plan, engineer, design, procure, acquire, construct, and install the State Equipment." The agreement further stated that Superferry and the State "shall work together to refine the plans, specifications, and drawings for the State Equipment, including providing information to and requesting information from Austal to the extent necessary to refine the design of the State Equipment."

Despite the availability of the State's barges and ramps for other ferry service operators, unless those operators used vessels nearly identical to Superferry's vessels, it is unclear how realistic it would be for them to utilize the State's equipment.

As in *Haman v. Marsh*, a highly improbable set of events would have to occur in order for another ferry vessel company to enter Act 2's class of "large capacity ferry vessel company" within the twenty-one month viability of Act 2. *See*, 467 N.W.2d at 848–49. First, the new company would have to build or acquire a vessel capable of transporting "at least five hundred passengers, two hundred motor vehicles, and cargo between the islands of the state." Act 2, § 2 at 7. There is no evidence in the record that any such vessel (other than Superferry's vessel) is in existence and could be acquired. The new company would thus have to build such a vessel, a process which ostensibly would be similar to Superferry's three years of construction. In addition, to utilize the State-built barges and ramps, the new vessel's dimensions and design would have to be nearly identical to Superferry's vessels. The new company would likely have to apply for and receive a CPCN from the Public Utilities Commission. Further, it would have to negotiate and finalize an operating agreement with the State. If space was available at the neighbor island harbors, the new company would have to construct its own passenger accommodations, subject to conditions similar to those imposed on Superferry. If space was not available for the construction of new passenger accommodations, the new company would have to negotiate and finalize an agreement with its competitor, Superferry, to share Superferry's existing passenger accommodations. If such an agreement could not be reached, however, it is unclear what options the new company would have.

This entire set of events would have to begin and end in less than twenty-one months to allow the new company to operate during the life of Act 2. In sum, there is nothing in the record to support the theoretical possibility of this scenario occurring in reality.[17]

Indeed, at oral argument on December 18, 2008, almost fourteen months after the enactment of Act 2 and seven months before its maximum expiration date, counsel for the

and screening process; (3) grouping and assembly process; (4) loading and unloading process; (5) provisioning and vessel services; (6) maintenance; (7) refuse removal; (8) security plans; (9) passenger assistance services; (10) description of duties and responsibilities of Superferry's managers; (11) contingency plans for handling emergencies; (12) vehicle movement and management plans; and (13) personnel plans.

17. To illustrate this point, we need look no further than Superferry's CPCN. Superferry applied for its CPCN on July 22, 2004. On December 30, 2004, Superferry received approval of the CPCN subject to certain conditions being met no later than October 31, 2006. Satisfaction of these conditions was required before Superferry could commence operations. After delays in negotiations with the State and the initiation of this lawsuit, Superferry requested that the PUC extend the deadline to June 1, 2007 to allow Superferry to: (1) deliver the Certificate of Inspection from the United States Coast Guard for the first vessel; (2) file an amended tariff; (3) post the tariff on Superferry's website; (4) provide evidence of compliance with applicable National Oceanic and Atmospheric Administration and

State and Superferry could not represent to the court that any other large capacity ferry vessel company had expressed any interest in coming within the benefits of Act 2.

Like the Glendale Bill considered in *In re Senate Bill No. 95 of the Forty–Third General Assembly*, once Act 2 accomplished its purpose of allowing Superferry to operate without meeting the requirements of HRS chapter 343, Act 2 will die before another large capacity ferry vessel company could come within its benefits. *See* 361 P.2d at 354 ("Once having accomplished [its] particular purpose the act would die before it could possibly accomplish a like purpose in any other place.").

### iii. Act 2 benefits only Superferry as only Superferry has an Operating Agreement with the State.

Section 1(b)(2) of Act 2 provides, in relevant part, that:

Agreements with respect to the operations of a large capacity ferry vessel company, including a large capacity ferry vessel company operating agreement, entered into between the State and a large capacity ferry vessel company, may be enforced as written or as executed or re-executed[.]

Act 2, § 1(b)(2) at 6.

The record in this case shows that only Superferry has an operating agreement with the State. Also, at oral argument on December 18, 2008, counsel for the State and Superferry could not represent to this court that any other large capacity ferry vessel company had an operating agreement with the State.

The benefits provided by Act 2 to a large capacity ferry vessel company were clearly intended to benefit only Superferry, as only Superferry has an operating agreement with the State.

### iv. Act 2 realistically restricts the benefits of its alternative environmental review process to Superferry.

Section 8 of Act 2 restricts the benefits of Act 2's alternative environmental review process to considering the impacts of operating a *single* large capacity ferry vessel company. Section 8 of Act 2 provides that:

The department of transportation shall prepare or contract to prepare an environmental impact statement for the improvements made or to be made to commercial harbors throughout the state that require the expenditure of public funds *to accommodate the use thereof by a large capacity ferry vessel company* and the secondary effects of those operations on the state's environment, including *the operation of the large capacity ferry vessel company*.

Act 2, § 8 at 12 (emphases added). There is no indication in section 8 that the required environmental impact statement must consider the impacts of operating more than one large capacity ferry vessel company. *Id.* Additionally, section 8 directs the preparation of only *one* environmental impact statement. *Id.* Upon the acceptance of this final environmental impact statement by the Office of Environmental Quality Control (OEQC), the Act and its alternative environmental review process will be repealed. *See* Act 2 § 12 at 17, § 18 at 20.

Based on the language of section 8, if future members attempted to join the class of "a large capacity ferry vessel company" during the twenty-one-month life of Act 2, the environmental impact statement prepared by DOT, which considered the impacts of only one company using State harbor facilities, ostensibly Superferry as it is the only large capacity ferry vessel company presently operating, would be inadequate even under

United States Coast Guard laws; (5) comply with the City and County of Honolulu permit process for wastewater disposal; (6) pay its water carrier gross revenue fee; and (7) provide insurance documents related to its vessels and harbor facilities.

If Superferry had met the original deadline set by the Public Utilities Commission, the CPCN would have been approved twenty-seven months after Superferry submitted its application. Tak-

ing into account Superferry's extension request, however, the CPCN actually required thirty-five months for approval. Under either deadline, twenty-one months was not an adequate period of time for Superferry to obtain an essential government approval prior to the commencement of its operations. As such, there is nothing in the record to suggest that the experiences of future companies would be different than Superferry's.

Act 2's alternative review process. *See* Act 2, § 9(d) at 12 ("The environmental impact statement shall contain an explanation of the environmental consequences of the action. The contents shall fully declare the environmental implications of the action and shall discuss all relevant and feasible consequences of the action."). In that case, an environmental impact statement for the additional large capacity ferry vessel company would likely be required.

If an environmental impact statement became necessary to properly consider the impacts of an additional company using State harbor facilities, that statement would not be governed by the process provided by Act 2. The OEQC's acceptance of the first environmental impact statement would trigger the automatic repeal of Act 2. As such, any future class members attempting to use State harbor facilities would be subject to an environmental review process governed by the more rigorous requirements of HRS chapter 343. *See* HRS § 343–5(b) (1993 & Supp. 2008) ("Acceptance of a required final statement shall be a *condition precedent* to implementation of the proposed action." (emphasis added)). Accordingly, future members of the class created by Act 2 would not have the right to operate during the environmental review process, a right granted to Superferry, the only qualifying class member at the time Act 2 was enacted.

Therefore, even if other companies attempted to enter the class of "a large capacity ferry vessel company" during the twenty-one-month existence of Act 2, those future members would not receive the same rights and benefits granted to Superferry, the single member in existence at the time of enactment. As such, the class created by Act 2 is "logically and factually limited to a 'class of one,' and thus is illusory." *Canister,* 110 P.3d at 385.

18. The goal of the task force is as follows:
to study the State's actions regarding the establishment of the operations of any large capacity ferry vessel company as a whole and to examine the impact, if any, of the operations of any existing or proposed large capacity ferry vessel company on:
(1) Ocean life and marine animals and plants, including but not limited to an existing or proposed inter-island ferry operations' whale avoidance policy and procedures;
(2) Water resources and quality;

### v. The task force provision limits the "large capacity ferry vessel company" class to a class of one.

Section 13 of Act 2 also makes it clear that the addition of future members to the "large capacity ferry vessel company" class is not reasonably probable. Act 2, § 13 at 18–19. Section 13 establishes "a temporary Hawaii inter-island ferry oversight task force"[18] and mandates that the thirteen-member task force "shall include":

(1) *The director* of transportation, or the director's designee;
(2) *The chairperson* of the board of agriculture, or the chair's designee;
(3) *The chairperson* of the board of land and natural resources, or the chairperson's designee;
(4) *The attorney general,* or the attorney general's designee;
(5) *The president* of a large capacity ferry vessel company, or the president's designee;
(6) One representative from each of the four major counties, *including at least one representative* from the environmental community, one representative who is active or knowledgeable in native Hawaiian cultural practices, *and one representative* from the general business community; provided that each such representative shall be *appointed by the speaker of the house of representatives;* and
(7) One representative from each of the four major counties, *including at least one representative* from the environmental community, one representative who is active or knowledgeable in native Hawaiian cultural practices, *and one representative* from the general business community; provided that each such representative shall be *appointed by the president of the senate.*

Act 2, § 13(b) at 18–19. (emphases added).

(3) Harbor infrastructure;
(4) Vehicular traffic;
(5) Public safety and security;
(6) The potential to spread invasive species;
(7) Cultural resources, including hunting, fishing, and native Hawaiian resources;
(8) Economic consequences and impact; and
(9) Any other natural resource or community concern.
Act 2, § 13(a) at 18.

The Act's description of these members makes clear that future members could not be added to the "large capacity ferry vessel company" class. Four of the mandatory members of the task force are designated by title, as they are official positions that may be occupied by only one person at a time (e.g. the director of transportation, the chairperson of the board of agriculture, the chairperson of the board of land and natural resources, the attorney general). *Id.* Eight of the other mandatory members are described as "representative[s]" of specific designated groups, which logically include more than one member. Act 2, § 13(b)(6)-(7) at 19. For these representative members, Act 2 provides a method for selecting each representative (i.e., appointment by the speaker of the house, § 13(b)(6), or by the president of the senate, § 13(b)(7)).

Significantly, the task force member related to a large capacity ferry vessel company is designated by title, *"[t]he president* of a large capacity ferry vessel company." Act 2, § 13(b)(5) at 19 (emphasis added). Unlike the members of the task force that represent a group with multiple members, the president of a large capacity ferry vessel company is not described as a representative. More importantly, Act 2 does not provide a selection process to determine how this member would be selected in the event that more than one eligible person existed. *See* Act 2 § 13(b)(5).

Section 13, therefore, makes it clear that Act 2's class of "a large capacity ferry vessel company" did not anticipate the addition of future class members and was "conceived, cut, [and] tailored" for Superferry. *In re Senate Bill No. 95,* 361 P.2d at 354.

d. *The second step of the Canister Marsh, 467 N.W.2d at 849;* Town of Surprise, *800 P.2d 1259.v. Marsh,* 467 N.W.2d at 849; *Town of Surprise,* 800 P.2d at 1259.analysis need not be addressed.

In summary, Article XI, section 5 of the Hawai'i Constitution, requires that "[t]he legislative power over the lands owned by or under the control of the State and its political subdivisions shall be exercised only by *general law.*" Haw. Const. art. XI, § 5 (emphasis added). We now adopt the following test for determining if a law is general for the purpose of Article XI, section 5 of the Hawai'i Constitution.

■ As previously stated by this court, a general law must apply uniformly. *Bulgo,* 50 Haw. at 58, 430 P.2d at 326. However, a law that applies uniformly to a particular class may also be a general law if: 1) the class created is genuine and not logically limited to a class of one and thus illusory, and 2) the class created is reasonable. See *Canister,* 110 P.3d at 383.

■ A class is not illusory if it could include other members in the future. *Id.* at 384. Further, the actual probablility of other members joining the class must be considered when determining if a class is illusory. *Haman v. Marsh,* 467 N.W.2d at 849; *Town of Surprise,* 800 P.2d at 1259.

Because we find that Act 2 created an illusory class (i.e., "large capacity ferry vessel company"), we need not address the second step of this test. *Canister,* 110 P.3d at 383.

Accordingly, we hold that Act 2 is a special law in violation of Article XI, section 5 of the Hawai'i Constitution. The circuit court thus erred when it concluded that Act 2 was constitutional and dismissed Sierra Club's claims as moot.

B. *Sierra Club Is Entitled to Reimbursement of Reasonable Attorney's Fees and Costs As The Prevailing Party*

In its January 31, 2008 final judgment, despite the enactment of Act 2 the circuit court restated that Sierra Club was the "prevailing party" and authorized Sierra Club to seek reimbursement from DOT and Superferry for reasonable attorney's fees and costs.[19] Accordingly, on March 27, 2008, the circuit court granted, in part, Sierra Club's request for reimbursement of reasonable at-

---

**19.** In paragraph D of the circuit court's October 9, 2007 order granting Plaintiffs' motion to enforce the judgment requiring an environmental assessment by prohibiting implementation of Hawaii Superferry Project and granting a perma-nent injunction, the circuit court stated: "Plaintiffs, as the prevailing parties, may, by separate motion, file a request for the reimbursement of their reasonable attorney's fees and costs incurred in this case."

torney's fees and costs. In granting the request, the circuit court found Superferry and DOT jointly liable, basing its award on both HRS § 607–25 and the private attorney general doctrine:

> The Court hereby grants Plaintiffs' Motion for Reimbursement of Reasonable Attorney's Fees and Costs [Filed on January 15, 2008], in part, based upon HRS § 607–25 and the Private Attorney General Doctrine, and awards Plaintiffs, with the exceptions noted on the record, attorney's fees, at the hourly rate of $200 per hour, and costs, both commencing as of August 24, 2007. The total amount of attorney's fees hereby awarded is $86,270.28. The total amount of costs hereby awarded is $5,442.44. The total amount of attorney's fees and costs hereby awarded is $91,712.72. Defendants [Superferry] and [DOT] shall pay this total amount of attorney's fees and costs to [Sierra Club].

DOT argues that "the circuit court erred in awarding fees and costs to the non-prevailing parties, whether that award was made under a purported application of the private attorney general doctrine or some other theory."

Superferry argues that the trial court erred in: (1) determining that Sierra Club was the prevailing party; (2) awarding Sierra Club its attorney's fees and costs against Superferry pursuant to HRS § 607–25; (3) awarding Sierra Club its attorney's fees and costs against Superferry pursuant to the private attorney general doctrine; (4) awarding attorney's fees at the rate of $200 per hour; and (5) awarding costs in the amount of $5,442.44.

Sierra Club argues that the circuit court erred by: (1) not awarding fees for the period of litigation prior to the initial appeal to this court; (2) not considering or giving weight to documents presented by Sierra Club on the issue of whether DOT and Superferry "relied in good faith" as required by HRS § 607–25(e)(3); and (3) not awarding fees at the rate of $300 per hour.

The first issue that must be determined regarding the fee and cost award is whether Sierra Club was the prevailing party. We agree with the circuit court that Sierra Club was the prevailing party.

20. Sierra Club notes that count II was later dismissed without prejudice and the parties

## 1. The circuit court correctly concluded that Sierra Club was the prevailing party.

 DOT and Superferry argue that Sierra Club was not the prevailing party in this case because final judgment was not rendered in its favor. DOT argues that "[t]he circuit court expressly entered final judgment in favor of [DOT] and Superferry and against [Sierra Club]." (Emphasis removed.) Superferry similarly argues that "[n]otwithstanding that this Court [sic] granted Plaintiffs permission 'to ... file' a request for attorney fees, ... the Final Judgment made clear that [Superferry] and [DOT], not [Sierra Club], were the prevailing parties." (Emphasis removed.)

Sierra Club contends that it is the prevailing party as determined by this court's ruling in *Sierra Club I* and several circuit court rulings prior to the enactment of Act 2. Sierra Club notes that it prevailed on four of five counts in the complaint that initiated this lawsuit: when this court's order reversed the DOT's exemption determination and held that an EA pursuant to HRS chapter 343 applied to the facts of the case; when the circuit court entered partial summary judgment in favor of Sierra Club on its claim for an EA;[20] when the circuit court voided the operating agreement on October 9, 2007, enjoined Superferry and DOT by issuing the TRO on August 27, 2007 and the permanent injunction on October 9, 2007, and awarded Sierra Club attorney's fees and costs on March 27, 2008. We agree with Sierra Club.

## 2. *Kamaka:* the prevailing party is determined by the final judgment.

 This court described the general rule for determining the prevailing party in a case in *Kamaka v. Goodsill Anderson Quinn & Stifel,* 117 Hawai'i 92, 176 P.3d 91 (2008), stating

> in general, a party in whose favor judgment is rendered by the district court is the prevailing party in that court, plaintiff or defendant, as the case may be. Although a plaintiff may not sustain his entire claim, *if judgment is rendered for him, he is the prevailing party for purposes of costs and [attorney's] fees.*

agreed "that the issues raised would be decided in another court."

*Id.* at 126, 176 P.3d at 125 (internal quotations and original brackets omitted) (emphasis in original) (quoting *MFD Partners v. Murphy,* 9 Haw.App. 509, 514, 850 P.2d 713, 716 (1992)). *Kamaka* considered an award for attorney's fees in a wrongful termination case. *Id.* at 97–98, 176 P.3d at 96–97. The jury in *Kamaka* found in favor of the plaintiff on one of three claims and awarded her $209,937.91 in special damages. *Id.* at 98, 176 P.3d at 97. Subsequently, the defendant was granted a renewed motion for judgment as a matter of law and the trial court entered final judgment in favor of the defendant as to all claims and entered an order granting the defendant's motion for attorney's fees and costs. *Id.*

Superferry and DOT rely on *Kamaka,* and several other cases, for support of the proposition that the party in whose favor final judgment is entered is the prevailing party. *Wong v. Takeuchi,* 88 Hawai'i 46, 49, 961 P.2d 611, 614 (1998); *Blair v. Ing,* 96 Hawai'i 327, 330, 31 P.3d 184, 187 (2001); *Mist v. Westin Hotels, Inc.,* 69 Haw. 192, 201, 738 P.2d 85, 92 (1987). *Kamaka* presents the general rule for prevailing parties, as discussed within the context of HRS § 607–14;[21] however, the general rule and HRS § 607–14 do not provide guidance in this case, where the underlying law of the claim was changed after a prevailing party had been declared. *See Kamaka,* 117 Hawai'i at 121, 176 P.3d at 120.

### 3. *Food Pantry:* the prevailing party is determined by the main issues.

The general rule for attorney's fees has been further defined in a case where final judgment did not make clear which party had prevailed. *Food Pantry, Ltd. v. Waikiki Business Plaza, Inc.,* 58 Haw. 606, 620, 575 P.2d 869, 879 (1978) (considering a lessor that prevailed on the basic issues of the case and was awarded damages, but was prevent-

ed from canceling the lease). In *Food Pantry,* this court concluded that "where a party prevails on the disputed main issue, even though not to the extent of his original contention, he will be deemed to be the successful party for the purpose of taxing costs and attorney's fees." *Id.* (footnote omitted). To determine which party prevailed on the main issues, the Intermediate Court of Appeals (ICA) has further held that "[t]he trial court is required to first identify the principle issues raised by the pleadings and proof in a particular case, and then determine, on balance, which party prevailed on the issues." *MFD Partners,* 9 Haw.App. at 515, 850 P.2d at 716; *see also Fought & Co., Inc. v. Steel Engineering & Erection, Inc.,* 87 Hawai'i 37, 53, 951 P.2d 487, 503 (1998).

### 4. *Sole:* the prevailing party is determined by the final judgment not the preliminary injunction.

Superferry and DOT argue that guidance on this issue should be found instead in cases consistent with the United States Supreme Court's decision in *Sole v. Wyner,* 551 U.S. 74, 127 S.Ct. 2188, 2194, 167 L.Ed.2d 1069 (2007). In *Sole,* the Court observed that " '[t]he touchstone of the prevailing party inquiry,' . . . is 'the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute.' " *Id.* at 2194 (quoting *Texas State Teachers Assn v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 792–93, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)). The Court held that "[p]revailing party status . . . does not attend achievement of a preliminary injunction that is reversed, dissolved, or otherwise undone by the final decision in the same case." *Id.* at 2195 (footnote omitted).

In *Sole,* the plaintiff sought and obtained a preliminary injunction to prevent the Florida Department of Environmental Protection

---

21. HRS § 607–14 provided at the time of *Kamaka:*

**Attorney's fees in actions in the nature of assumpsit, etc.** In all the courts, in all actions in the nature of assumpsit and in all actions on a promissory note or other contract in writing that provides for an attorney's fee, there shall be taxed as [attorney's] fees, to be paid by the losing party and to be included in the sum for which execution may issue, a fee that the court determines to be reasonable; provided that the attorney representing the prevailing party shall

submit to the court an affidavit stating the amount of time the attorney spent on the action and the amount of time the attorney is likely to spend to obtain a final written judgment, or, if the fee is not based on an hourly rate, the amount of the agreed upon fee. The court shall then tax [attorney's] fees, which the court determines to be reasonable, to be paid by the losing party; provided that this amount shall not exceed twenty-five percent of the judgment.

*Kamaka,* 117 Hawai'i at 121, 176 P.3d at 120.

from interfering with an art display planned to take place within a beach park that would consist of "nude individuals assembled into a peace sign." *Id.* at 2192. The plaintiff also requested permanent injunctive relief "against interference with 'future expressive activities that may include non-erotic displays of nude human bodies.'" *Id.* The plaintiff was granted the preliminary injunction as to the peace sign display, but was later denied a permanent injunction. *Id.* at 2192–93. The trial court concluded, and the appellate court affirmed, that the plaintiff qualified as a prevailing party to the extent of the preliminary injunction, and awarded plaintiff attorney's fees to cover that stage of litigation. *Id.* at 2193–94. The Supreme Court reversed that conclusion. *Id.* at 2194.

*Sole* is distinguishable from this case, however. In *Sole*, the Supreme Court centered its reasoning on the circumstances of the preliminary injunction:

In some cases, the proceedings prior to a grant of temporary relief are searching; in others, little time and resources are spent on the threshold contest.

In this case, the preliminary injunction hearing was necessarily hasty and abbreviated. Held one day after the complaint was filed and one day before the event, the timing afforded the state officer defendants little opportunity to oppose Wyner's emergency motion. Counsel for the state defendants appeared only by telephone. The emergency proceeding allowed no time for discovery, nor for adequate review of documents or preparation and presentation of witnesses. The provisional relief immediately granted expired before appellate review could be gained, and the court's threshold ruling would have no preclusive effect in the continuing litigation. Both the District Court and the Court of Appeals considered the preliminary injunction a moot issue, not fit for reexamination or review, once the display took place. In short, the provisional relief granted terminated only the parties' opening engagement. Its tentative character, in view of the continuation of the litigation to definitively resolve the controversy, would have

made a fee request at the initial stage premature.

*Id.* at 2195 (internal citations omitted).

**5. The *Food Pantry* approach is most appropriate for this case.**

We agree with Sierra Club that the inquiry outlined by this court in *Food Pantry*, 58 Haw. at 620, 575 P.2d at 879, and further interpreted by the ICA in *MFD Partners*, 9 Haw.App. at 514, 850 P.2d at 716, is more appropriate considering the facts of this case.

 a. *The circuit court determined that Sierra Club had prevailed on the principle issue of the case.*

In this case, the circuit court determined that Sierra Club prevailed on the merits of the claim requiring preparation of an EA pursuant to HRS chapter 343 and granted summary judgment in favor of the Plaintiffs. Subsequently, the circuit court conducted four weeks of evidentiary hearings before issuing an order to enforce the judgment requiring an EA and granting a permanent injunction in favor of Sierra Club. The court expressly recognized Sierra Club as the prevailing party, and authorized Sierra Club to file a request for attorney's fees and costs.

Moreover, prior to issuing its order, the circuit court stated during the October 9, 2007 hearing on the motion to enforce the EA:

In this particular instance, as noted, the plaintiffs have prevailed on the merits, on their claim for an environmental assessment. So it is clear that that has been resolved in this case. That is a decision that was issued by the Supreme Court of the State of Hawaii, the highest court in this state. That is the final decision with respect to the evironment [sic] assessment claim.

Later during the same hearing, the circuit court stated:

The Court will, therefore, issue an injunction prohibiting further implementation of the Hawaii Superferry project at the Kahului Harbor until the Hawaii Department of Transportation prepares a legally acceptable environmental assessment based upon the applicable Hawaii Adminis-

trative Rules and based upon the Hawai'i Revised Statutes Chapter 343.

The plaintiffs are the prevailing party with respect to this matter. Therefore, the Court will authorize the issuance of an order for reasonable fees and costs. The plaintiffs are instructed to submit to this Court proposed findings, conclusions, and an order.

b. *Act 2 did not change the status of Sierra Club as the prevailing party.*

DOT and Superferry argue that Sierra Club could not be the prevailing party after Act 2 was enacted, and cite *Sole* in support. This argument is without merit.

Unlike *Sole*, in this case Act 2 changed the underlying law that ultimately resulted in a final judgment in favor of Superferry and DOT, rather than a change in the final decision in the same case based on application of the same law as was the case in *Sole*. *Sole*, 127 S.Ct. at 2195. Additionally, several federal cases provide support for the proposition that parties may be considered prevailing when they have achieved only part of the benefit sought by the suit, including an injunction of limited duration. *See Farrar v. Hobby*, 506 U.S. 103, 109, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); *Garland Indep. Sch. Dist.*, 489 U.S. at 792, 109 S.Ct. 1486; *Nat'l Black Police Ass'n v. D.C. Bd. of Elec.*, 168 F.3d 525, 530 (D.C.Cir.1999); *Richard S. v. Dept. of Developmental Servs.*, 317 F.3d 1080 (9th Cir.2003); *Young v. City of Chicago*, 202 F.3d 1000 (7th Cir.2000); *Virzi Subaru v. Subaru of New England*, 742 F.2d 677 (1st Cir.1984); *Williams v. Alioto*, 625 F.2d 845 (9th Cir.1980); *Black Hills Alliance v. Reg'l Forester*, 526 F.Supp. 257 (D.C.S.D.1981).

Accordingly, it was not error for the circuit court to determine that the EA requirement pursuant to HRS chapter 343 was the main disputed issue in the litigation prior to November 2, 2007. As such, it also was not error for the circuit court to find that Sierra Club was the "prevailing party" in the litigation under the unique facts of this case where the underlying applicable law was changed prior to a final judgment being entered.

Since Sierra Club prevailed under the law applicable to the case prior to Act 2's enact-

ment, this court must now consider whether Sierra Club is entitled to recover reasonable attorney's fees and costs from both DOT and Superferry based on the private attorney general doctrine and HRS § 607–25, as concluded by the circuit court.

C. *Sierra Club Is Entitled to Recover Attorney's Fees from DOT and Superferry Pursuant to the Private Attorney General Doctrine*

 DOT and Superferry argue that the private attorney general doctrine has not been adopted by this court and the circuit court erred in granting an award of attorney's fees against them pursuant to this doctrine. We disagree.

1. **The Private Attorney General Doctrine**

 We have previously stated that "[n]ormally, pursuant to the 'American Rule,' each party is responsible for paying his or her own litigation expenses. This general rule, however, is subject to a number of exceptions: attorney's fees are chargeable against the opposing party when so authorized by statute, rule of court, agreement, stipulation, or precedent[.]" *Fought*, 87 Hawai'i at 50–51, 951 P.2d at 500–01. Precedent from this court has recognized the exception provided by the private attorney general doctrine, which

> is an equitable rule that allows courts in their discretion to award [attorney's] fees to plaintiffs who have vindicated important public rights. Courts applying this doctrine consider three basic factors: (1) the strength or societal importance of the public policy vindicated by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, [sic] (3) the number of people standing to benefit from the decision.

*Maui Tomorrow v. BLNR*, 110 Hawai'i 234, 244, 131 P.3d 517, 527 (2006) (quoting *In re Water Use Permit Applications (Waiahole II)*, 96 Hawai'i 27, 29, 25 P.3d 802, 804 (2001)). Although the private attorney general doctrine has been acknowledged by this court, we previously did not find the doctrine

applicable in either of the two cases where it was considered, which cases will now be discussed.

### a. *Waiahole II*

This court first considered the private attorney general doctrine in *Waiahole II*, where multiple public interest parties sought an attorney's fees award against private and government parties following the partial reversal of an agency decision. *Waiahole II*, 96 Hawai'i at 28–29, 25 P.3d at 803–04. This court cited arguments in favor of adopting the doctrine articulated by the California Supreme Court:

> Although there are within the executive branch of the government offices and institutions (exemplified by the Attorney General) whose function it is to represent the general public in such matters and to ensure proper enforcement, for various reasons the burden of enforcement is not always adequately carried by those offices and institutions, rendering some sort of private action imperative. Because the issues involved in such litigation are often extremely complex and their presentation time-consuming and costly, the availability of representation of such public interests by private attorneys acting *pro bono publico* is limited. Only through the appearance of "public interest" law firms funded by public and foundation monies ... has it been possible to secure representation on any large scale. Certain firms ..., however, are not funded to the extent necessary for the representation of all such deserving interests, and as a result many worthy causes of this nature are without adequate representation under present circumstances. One solution, so the argument goes, within the equitable powers of the judiciary to provide, is the award of substantial attorneys fees to those public-interest litigants and their attorneys (whether private attorneys acting *pro bono* or

members of "public interest" law firms) who are successful in such cases, to the end that support may be provided for the representation of interests of similar character in future litigation.

*Id.* at 30, 25 P.3d at 805 (brackets removed) (quoting *Serrano v. Priest*, 20 Cal.3d 25, 141 Cal.Rptr. 315, 569 P.2d 1303, 1313–14 (1977)). Based on this rationale, this court stated that the purpose of the private attorney general doctrine "is to promote vindication of important public rights." *Id.* (quoting *Arnold v. Dep't of Health Servs.*, 160 Ariz. 593, 775 P.2d 521, 537 (1989)).[22]

In discussing the three prongs of the doctrine in relation to the facts of *Waiahole II*, this court found that the first and third prongs of the doctrine were satisfied because *Waiahole II* "involved constitutional rights of profound significance, and all of the citizens of the state, present and future, stood to benefit from the decision." *Id.* at 31, 25 P.3d at 806. Ultimately, however, this court found that the private attorney general doctrine did not apply to the facts in *Waiahole II* because the second prong of the test, "the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff," had not been met. *Id.* (internal quotation marks omitted). The plaintiffs in *Waiahole II* had "represented one of many competing public and private interests in an adversarial proceeding before the governmental body designated by constitution and statute as the primary representative of the people with respect to water resources[.]" *Id.* These plaintiffs were distinguished from plaintiffs in other cases where the private attorney general doctrine had been applied, observing that "unlike other cases, in which the plaintiffs single-handedly challenged a previously established government law or policy, in this case, the Windward Parties challenged the decision of a tribunal in an adversarial proceeding not contesting any ac-

---

22. This court also recognized in *Waiahole II* that "[a] number of courts have adopted and applied the 'private attorney general' doctrine in awarding [attorney's] fees to public-interest litigants." *Waiahole II*, 96 Hawai'i at 30, 25 P.3d at 805 (citing *Serrano*, 569 P.2d 1303; *Arnold*, 775 P.2d 521; *Hellar v. Cenarrusa*, 106 Idaho 571, 682 P.2d 524 (1984); *Watkins v. Labor & Indus. Review Comm'n*, 117 Wis.2d 753, 345 N.W.2d 482 (1984); *Montanans for the Responsible Use of the Sch. Trust v. State ex rel. Bd. of Land Comm'rs*, 296 Mont. 402, 989 P.2d 800 (1999); *Stewart v. Pub. Serv. Comm'n*, 885 P.2d 759 (Utah 1994); *Town of St. John v. State Bd. of Tax Comm'rs*, 730 N.E.2d 240 (Ind.Tax 2000)).

tion or policy of the government." *Id.* at 32, 25 P.3d at 807. Accordingly, this court found that the facts of *Waiahole II* did not qualify for an award of attorney's fees under "the conventional application of the private attorney general doctrine." *Id.*

### b. *Maui Tomorrow*

The private attorney general doctrine was revisited by this court in *Maui Tomorrow.* In beginning our analysis of the *Maui Tomorrow* facts, we reviewed our discussion of the private attorney general doctrine in *Waiahole II,* and concluded that "[w]e held that the doctrine did not apply under the facts of that case, *but did not foreclose application of the doctrine in a future case.*" *Maui Tomorrow,* 110 Hawai'i at 244, 131 P.3d at 527 (emphasis added). This court then applied the *Waiahole II* three-prong test and, as in *Waiahole II,* the facts did not satisfy the three prongs of the doctrine. *Id.* at 245, 131 P.3d 517, 131 P.3d at 528. *Maui Tomorrow* also focused on the second prong of the doctrine and found that unlike *Waiahole II,* the plaintiffs were challenging an established government policy. *Id.* (challenging BLNR's policy of leasing water rights without performing a required EA). The court was careful to note, however, that the policy was the result of an "erroneous" understanding between two state agencies, rather than actions by the State to abandon or actively oppose the plaintiffs' cause. *Id.*

### 2. Application of the Three–Prong Test of the Private Attorney General Doctrine to the Facts of This Case

DOT and Superferry argue that none of the private attorney general doctrine prongs are satisfied in this case. Sierra Club disagrees and argues that all three prongs of the doctrine have been satisfied. We agree with Sierra Club.

### a. *first prong: strength or societal importance of the public policy vindicated by the litigation*

DOT and Superferry argue that no public policy was vindicated by Sierra Club's litigation because the policy underlying HRS chapter 343 was never at risk. Rather, DOT and Superferry claim that the litigation was based on an erroneous determination of DOT in applying the policy of HRS chapter 343. Sierra Club disagrees and notes that this litigation is responsible for establishing the principle of procedural standing in environmental law in Hawai'i and clarifying the importance of addressing the secondary impacts of a project in the environmental review process pursuant to HRS chapter 343. We agree with Sierra Club.

### b. *second prong: the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff*

As to the second prong, DOT and Superferry argue that this litigation was not necessary to enforce DOT's duties under HRS chapter 343, and the burden on Sierra Club for bringing the action was relatively minor. They argue that (1) there were three separate organizations to share the expenses of attorney's fees and costs, (2) litigation is one of the purposes of Sierra Club, and (3) Sierra Club has received fee discounts from its attorney. Sierra Club argues that it was necessary for it to bring this action to enforce DOT's duties to the public under the Hawai'i Constitution, statutes, and the public trust doctrine. We agree with Sierra Club.

Unlike *Waiahole II,* the plaintiffs in this case were comprised of two non-profit organizations and an unincorporated association. *See Waiahole II,* 96 Hawai'i at 32, 25 P.3d at 807. These groups were solely responsible for challenging DOT's erroneous application of its responsibilities under HRS chapter 343. As this court stated in *Sierra Club I,*

> [s]tated simply, the record in this case shows that DOT did not consider whether its facilitation of the Hawaii Superferry Project will probably have minimal or no significant impacts, both primary and secondary, on the environment. Therefore, based on this record, we can only conclude that DOT's determination that the improvements to Kahului Harbor are exempt from the requirements of HEPA was erroneous as a matter of law. The exemption being invalid, the EA requirement of HRS § 343–5 is applicable.

*Sierra Club I*, 115 Hawai'i at 342, 167 P.3d at 335. In contravention of its responsibilities under the laws of this state, DOT exempted the Superferry project from the requirements of HRS chapter 343 without considering its secondary impacts on the environment. The action brought by Sierra Club clarified DOT's responsibilities under HRS chapter 343 by challenging DOT's erroneous interpretation of those duties.

This case is similarly distinguishable from *Maui Tomorrow*, where the challenged government policy resulted from an erroneous understanding that another state agency was to perform the duty at issue. *Maui Tomorrow*, 110 Hawai'i at 245, 131 P.3d at 528. In *Maui Tomorrow*, the duty had not been abandoned, rather it had been recognized with an assumption that it would be addressed by another agency. *Id.* In this case, DOT simply did not recognize its duty to consider both the primary and secondary impacts of the Superferry project on the environment. DOT was not under the erroneous understanding that another agency was considering those impacts, as in *Maui Tomorrow*; rather, in this case DOT wholly abandoned that duty by issuing an erroneous exemption to Superferry.

c. *third prong: the number of people standing to benefit from the decision*

DOT and Superferry argue that Sierra Club's "theory of benefit is based on the Hawaii Supreme Court decision that was supplanted by Act 2." Sierra Club argues, however, that this court's opinion in *Sierra Club I* provided a public benefit, because it is generally applicable law that established procedural standing in environmental law and clarified the need to address secondary impacts in environmental review pursuant to HRS chapter 343 and will "benefit large numbers of people over long periods of time." Sierra Club also cites to this court's opinion in *Sierra Club I*, 115 Hawai'i at 343, 167 P.3d at 336, which stated: " 'All parties involved and society as a whole' would have benefitted had the public been allowed to participate in the review process of the Superferry project, as was envisioned by the legislature when it enacted the Hawai'i Environmental Policy Act." (Emphasis removed.) We agree with

Sierra Club, and further note that with our holding today that Act 2 is unconstitutional, DOT and Superferry's reliance on Act 2 is without merit.

█ In sum, the facts of this case satisfy all three prongs of the private attorney general doctrine. Sierra Club having met the requirements for entitlement to the benefits of the private attorney general doctrine, we adopt the doctrine. Application of the private attorney general doctrine is, however, subject to the defenses which a defendant may have, so we now turn to the respective defenses asserted by Superferry and DOT to its application.

3. **The circuit court did not err in awarding attorney's fees against DOT and Superferry pursuant to the private attorney general doctrine.**

DOT and Superferry argue that HRS § 607–25 provides the exclusive means of seeking an award of attorney's fees and costs for litigation involving violations of HRS chapter 343. As such, they argue that HRS § 607–25 prevents an award of attorney's fees pursuant to the private attorney general doctrine in this case. *Id.* We disagree.

DOT further argues that the legislature chose to award attorney's fees and costs for violations of HRS chapter 343 exclusively against private parties when it enacted HRS § 607–25. As such, DOT argues that such an award cannot be imposed against it, as a public party, pursuant to HRS § 607–25. Finally, DOT argues that sovereign immunity prevents an award of attorney's fees against it pursuant to the private attorney general doctrine.

Superferry agrees with DOT that HRS § 607–25 authorizes an award of attorney's fees and costs against private parties for violations of HRS chapter 343; however, it argues that HRS § 607–25 is not applicable to Superferry's actions in this case.

In contrast, Sierra Club argues that: (1) HRS § 607–25 is not the exclusive means for awarding attorney's fees and costs for violations of HRS chapter 343, and (2) nonetheless, an award of attorney's fees and costs

against Superferry pursuant to HRS § 607–25 is appropriate in this case.

We conclude that: (1) HRS § 607–25 is not the exclusive means for awarding attorney's fees and costs for violations of HRS chapter 343; (2) HRS § 607–25 does not prevent an award of attorney's fees against Superferry pursuant to the private attorney general doctrine; and (3) sovereign immunity does not prevent an award of attorney's fees against DOT pursuant to the private attorney general doctrine in this case.

 a. *HRS § 607–25 is not the exclusive means for awarding attorney's fees and costs for violations of HRS chapter 343.*

■ In broad terms, the focus of HRS § 607–25 is civil suits that seek to enjoin parties that have been or are "undertaking any development without obtaining all permits or approvals required by law from government agencies[.]" HRS § 607–25(e).[23] DOT argues that through HRS § 607–25 the legislature authorized attorney's fees "in certain circumstances for non-compliance with chapter 343, but only in litigation between private parties." DOT suggests that the plain language of the statute indicates an intention to limit any award of attorney's fees and costs for a violation of HRS chapter 343 to the circumstances defined by HRS § 607–25. We disagree with this interpretation.

HRS chapter 343 provides "a system of environmental review," HRS § 343–1, that applies to nine different categories of actions that may be undertaken by public or private parties. *See* HRS § 343–5(a) (1993 & Supp. 2007).[24] Actions that fall within any of these

23. HRS § 607–25(e) provides:
In any civil action in this State where a private party sues for injunctive relief against another private party who has been or is undertaking any development without obtaining all permits or approvals required by law from government agencies:
 (1) The court may award reasonable [attorney's] fees and costs of the suit to the prevailing party.
 (2) The court shall award reasonable [attorney's] fees and costs of the suit to the prevailing party if the party bringing the civil action:
 (A) Provides written notice, not less than forty days prior to the filing of the civil action, of any violation of a requirement for a permit or approval to:
 (i) The government agency responsible for issuing the permit or approval which is the subject of the civil action;
 (ii) The party undertaking the development without the required permit or approval; and
 (iii) Any party who has an interest in the property at the development site recorded at the bureau of conveyances.
 (B) Posts a bond in the amount of $2,500 to pay the [attorney's] fees and costs provided for under this section if the party undertaking the development prevails.
 (3) Notwithstanding any provision to the contrary in this section, the court shall not award [attorney's] fees and costs to any party if the party undertaking the development without the required permit or approval failed to obtain the permit or approval due to reliance in good faith upon a written statement, prepared prior to the suit on the development, by the government agency responsible for issuing the permit or approval which is the subject of the civil action, that the permit or approval was not required to commence the development. The party undertaking the development shall provide a copy of the written statement to the party bringing the civil action not more than thirty days after receiving the written notice of any violation of a requirement for a permit or approval.
 (4) Notwithstanding any provision to the contrary in this section, the court shall not award [attorney's] fees and costs to any party if the party undertaking the development applies for the permit or approval which is the subject of the civil action within thirty days after receiving the written notice of any violation of a requirement for a permit or approval and the party undertaking the development shall cease all work until the permit or approval is granted.
HRS § 607–25(e) (1993 & Supp.2007).

24. HRS § 343–5(a) provides:
Except as otherwise provided, an environmental assessment shall be required for actions that:
 (1) Propose *the use of state or county lands or the use of state or county funds*, other than funds to be used for feasibility or planning studies for possible future programs or projects that the agency has not approved, adopted, or funded, or funds to be used for the acquisition of unimproved real property; provided that the agency shall consider environmental factors and available alternatives in its feasibility or planning studies; provided further that an environmental assessment for proposed uses under section [205–2(d)(10)] or [205–4.5(a)(13)] shall only be required pursuant to section 205–5(b);

categories require, at a minimum, an environmental assessment and may require additional stages of environmental review, as provided by HRS § 343–5. *See* HRS § 343–5. Five of the nine categories of actions defined by HRS § 343–5(a) consider "the use" or "any use" of specific types of lands. *See* HRS § 343–5(a)(1)–(5).

By contrast, HRS § 607–25 limits its scope to the acts of a private party "who has been or is undertaking *any development*[25] without obtaining all permits or approvals required by law from government agencies[.]" HRS § 607–25(e) (emphasis added). By focusing specifically on "development" rather than the more general "use" of lands, the text of HRS § 607–25 addresses only a subset of the actions that may lead to a violation of HRS § 343–5. Nothing in the text of HRS § 607–25 indicates that, despite its narrower focus, HRS § 607–25 should provide the exclusive means for awarding attorney's fees and costs against a party for a violation of HRS chapter 343.

Without such explicit language, we cannot conclude that HRS § 607–25 provides the exclusive means for awarding attorney's fees and costs for a violation of HRS chapter 343.

b. *HRS § 607–25 does not prevent an award of attorney's fees against Superferry pursuant to the private attorney general doctrine.*

▆▆▆▆ Superferry further contends that the circuit court erred in awarding attorney's fees and costs to Sierra Club against Superferry based on HRS § 607–25.

Specifically, Superferry argues that an award for attorney's fees and costs pursuant

(2) Propose *any use within any land classified as a conservation district* by the state land use commission under chapter 205;

(3) Propose *any use within a shoreline area* as defined in section 205A–41;

(4) Propose *any use within any historic site as designated in the National Register or Hawaii Register,* as provided for in the Historic Preservation Act of 1966, Public Law 89–665, or chapter 6E;

(5) Propose *any use within the Waikiki area of Oahu,* the boundaries of which are delineated in the land use ordinance as amended, establishing the "Waikiki Special District";

(6) Propose *any amendments to existing county general plans* where the amendment would result in designations other than agriculture, conservation, or preservation, except actions proposing any new county general plan or amendments to any existing county general plan initiated by a county;

(7) Propose *any reclassification of any land classified as a conservation district* by the state land use commission under chapter 205;

(8) Propose the construction of new or the expansion or modification of existing helicopter facilities within the State, that by way of their activities, may affect:
 (A) Any land classified as a conservation district by the state land use commission under chapter 205;
 (B) A shoreline area as defined in section 205A–41; or
 (C) Any historic site as designated in the National Register or Hawaii Register, as provided for in the Historic Preservation Act of 1966, Public Law 89–665, or chapter 6E; or until the statewide historic places inventory is completed, any historic site that is found by a field reconnaissance of the area affected by the helicopter facility and is under consideration for placement on the National Register or the Hawaii Register of Historic Places; and

(9) Propose any:
 (A) Wastewater treatment unit, except an individual wastewater system or a wastewater treatment unit serving fewer than fifty single-family dwellings or the equivalent;
 (B) Waste-to-energy facility;
 (C) Landfill;
 (D) Oil refinery; or
 (E) Power-generating facility.

HRS § 343–5(a) (1993 & Supp.2007) (emphases added) (brackets in original).

25. HRS § 607–25 defines "development" as including:

(1) The placement or erection of any solid material or any gaseous, liquid, solid, or thermal waste;

(2) The grading, removing, dredging, mining, pumping, or extraction of any liquid or solid materials; or

(3) The construction or enlargement of any structure requiring a discretionary permit.

HRS § 607–25(a). "Development" does not include:

(1) The transfer of title, easements, covenants, or other rights in structures or land;

(2) The repair and maintenance of existing structures;

(3) The placement of a portable structure costing less than $500; or

(4) The construction of a structure which only required a building permit and for which a building permit could be granted without any discretionary agency permit or approval.

HRS § 607–25(b).

to HRS § 607–25 was improper, because: (1) Sierra Club was not the prevailing party; (2) Superferry was not a "private party who has been or is undertaking any development without obtaining all permits or approvals required by law from government agencies;" and (3) Superferry falls within the "safe harbor" provision of HRS § 607–25 because it relied in good faith on DOT's HRS chapter 343 exemption determination.

First, as discussed previously, we conclude that Sierra Club was the prevailing party in this case. *See supra* Part IV.B. Second, we agree with Superferry that it was not "undertaking any *development* without obtaining all permits or approvals required by law from government agencies" during the period of litigation for which the circuit court awarded attorney's fees and costs against Superferry based on HRS § 607–25. HRS § 607–25(e) (emphasis added). As we agree with Superferry on its second point, we need not address Superferry's third point on this issue.

The circuit court's March 27, 2008 order granting attorney's fees and costs to Sierra Club did not provide underlying findings or conclusions regarding the basis of the award for attorney's fees and costs, but simply stated

The Court hereby grants Plaintiffs' Motion for Reimbursement of Reasonable Attorney's Fees and Costs [Filed on January 15, 2008], in part, based upon HRS § 607–25 and the Private Attorney General Doctrine, and awards Plaintiffs, with the exceptions noted on the record, attorney's fees, at the hourly rate of $200 per hour, and costs, *both commencing as of August 24, 2007.* The total amount of attorney's fees hereby awarded is $86,270.28. The total amount of costs hereby awarded is $5,442.44. The total amount of attorney's fees and costs hereby awarded is $91,712.72. Defendants [Superferry] and [DOT] shall pay this total amount of attorney's fees and costs to [Sierra Club].

(Emphasis added.) However, on February 13, 2008, prior to issuing its order, the circuit court heard arguments from all parties on Sierra Club's motion for reimbursement of reasonable attorney's fees and costs before stating:

Having considered the entire record of these proceedings, the legislative and executive action that followed the appellate court opinion, and the order issued by this Court, the Court deems it appropriate to conclude that the plaintiffs should be awarded their attorney's fees and costs, both under 607–25[sic], and under the Private Attorney General doctrine. So the Court, at this time, will award fees and costs in favor of plaintiffs against defendants.

Based on the record I have before me and in light of the, at least at this point, what is a record of an agency exemption determination and the earlier order of this Court, the fees and costs that this Court is going to award would be those that begin on August 24th, 2007. . . .

So it will begin with that date. I'm not going to award fees and costs during the appellate proceedings. I will not award fees and costs for matters that occurred prior to the appellate court proceedings, at least based on the record that I have before me today. Noting that the—there was an agency determination, as well as this Court's order granting the defendant's [sic] motion.

So, fees and costs will be awarded from that date, August 24th, 2007, at an hourly rate of $200.00 per hour. There may be a variety of ways of looking at the hourly rate, in the Court's view this is a very unique situation. Schefke [sic] would appear to apply. I do realize that the plaintiffs argue that, and I am satisfied that all of those factors are met here and that the plaintiffs argue that the appropriate amount should be $300.00 per hour, but this Court concludes it should be $200.00 per hour.

Superferry argues that the award against it pursuant to HRS § 607–25 was improper because Superferry was not a "private party who has been or is undertaking any development without obtaining all permits or approvals required by law from government agencies[.]" HRS § 607–25(e). Superferry argues that it was not "undertaking any de-

velopment" that required Superferry, rather than DOT, to obtain permits or approvals to comply with HRS chapter 343. Superferry further contends that even if it had been involved in "development," as contemplated by HRS § 607–25, those activities took place prior to this court's August 23, 2007 order. Superferry argues that if the circuit court determined, for the purposes of HRS § 607–25, that Superferry lacked "approvals" required under HRS chapter 343 based on this court's August 23, 2007 order, then Superferry's "development" activities should have occurred after August 23, 2007 as well. Superferry argues that *using* developments that were already constructed, as it did after August 23, 2007, does not fit the definition of "development" as provided by HRS § 607–25. We agree with Superferry.

Although the circuit court had discretion pursuant to HRS § 607–25(e)(1) to award reasonable attorney's fees and costs to the prevailing party, that award had to be made in a civil action brought by a private party against another private party that had been or was "undertaking ... development without obtaining all permits or approvals required by law[.]" HRS § 607–25(e). Based on the record in this case, there is no support for the circuit court's conclusion that on or after August 24, 2007 Superferry qualified under HRS § 607–25(e) as a private party that was "undertaking ... development without obtaining all permits or approvals required by law[.]"

Accordingly, we conclude that the circuit court erred in awarding Sierra Club attorney's fees and costs against Superferry based on HRS § 607–25.

As established in the prior sections herein, however, we have concluded that: (1) HRS § 607–25 is not the exclusive means for awarding attorney's fees and costs for litigation involving violations of HRS chapter 343; and (2) the facts of this case satisfy each of the three prongs of the private attorney general doctrine. *See supra* Parts IV.C.3.a.; IV.C.2. Moreover, we see no reason not to apply the private attorney general doctrine to a private defendant. As stated by the Court of Appeals of Arizona in *Arizona Cen-*

*ter For Law in the Public Interest v. Hassell,* 172 Ariz. 356, 837 P.2d 158 (Ct.App.1991):

We award these fees not only against the public entities among the appellees but also against the private appellees. Contrary to their argument, we do not find that the exclusive purpose of the private attorney general doctrine is to impose the cost of vindicating public rights on the public itself. Awarding [attorney's] fees against private defendants in appropriate cases will promote important public rights to the same extent as awarding fees against governmental defendants. Moreover, we find no unfairness in requiring the intervenor-appellees to share with the state the burden of appellants' partial victory in this case. The intervenor-appellees came to the state's aid to promote interests of their own that were more specific and substantial than those of members of the general public. And as the record makes quite plain, their participation added significantly to the legal effort required to prosecute appellants' claims.

*Id.* at 173.

Similarly, in this case Superferry worked hand-in-hand with DOT throughout the planning and implementation of the Superferry project and throughout this litigation, in promoting its own private business interests. Under these facts, we see no unfairness in requiring Superferry, jointly with DOT, to pay Sierra Club's attorney's fees awarded by the circuit court.

Accordingly, the circuit court did not err in relying on the private attorney general doctrine as a basis for its award of attorney's fees against Superferry.

 c. *Sovereign immunity does not bar application of the private attorney general doctrine against DOT.*

 ■ DOT argues that sovereign immunity prevents the application of the private attorney general doctrine against the State. We disagree.

 ■ The doctrine of sovereign immunity refers to the general rule, incorporated in the Eleventh Amendment to the United States Constitution, that a state cannot be

sued in federal court without its consent or an express waiver of its immunity. U.S. Const. amend. XI. The doctrine of sovereign immunity, as it has developed in Hawai'i, also precludes such suits in state courts.

*State ex rel. Anzai v. Honolulu,* 99 Hawai'i 508, 515, 57 P.3d 433, 440 (2002) (footnote omitted) (citing *Pele Defense Fund v. Paty,* 73 Haw. 578, 606–07, 837 P.2d 1247, 1264–65 (1992); *W.H. Greenwell, Ltd. v. Dep't of Land & Natural Res.,* 50 Haw. 207, 208, 436 P.2d 527, 528 (1968)).

We have recognized the clear distinction between the effect of sovereign immunity on actions seeking prospective relief and those seeking retrospective relief, stating:

> [i]n previous cases, we have held that "the sovereign State is immune from suit for money damages, except where there has been a 'clear relinquishment' of immunity and the State has consented to be sued." [*Pele Defense Fund v. Paty,* 73 Haw. 578,] 607, 837 P.2d [1247,] 1265 [ (1992), *cert. denied,* 507 U.S. 918, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993) ] (citing *Washington v. Fireman's Fund Ins. Co.,* 68 Haw. 192, 198, 708 P.2d 129, 134 (1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 977 (1986)). This exception to sovereign immunity can be traced to *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Accordingly, we have adopted the rule in *Young,* which:

> > makes an important distinction between prospective and retrospective relief. If the relief sought against a state official is prospective in nature, then the relief may be allowed regardless of the state's sovereign immunity. This is true "even

though accompanied by a substantial ancillary effect on the state treasury." However, relief that is "tantamount to an award of damages for a past violation of ... law, even though styled as something else," is barred by sovereign immunity.

*Pele,* 73 Haw. at 609–10, 837 P.2d at 1266 (footnotes and citations omitted).

*Bush v. Watson,* 81 Hawai'i 474, 481, 918 P.2d 1130, 1137 (1996) (holding that sovereign immunity did not bar an action seeking prospective relief for ongoing violations of the Hawaiian Homes Commission Act by existing and future third party agreements). We have also previously stated "that an award of costs and fees to a prevailing party is inherently in the nature of a damage award." *Fought,* 87 Hawai'i 37, 51, 951 P.2d 487, 501.

Accordingly, to properly award attorney's fees and costs against DOT in this case, there must be "a clear relinquishment" of the State's immunity in this case. *Bush,* 81 Hawai'i at 481, 918 P.2d at 1137.

### i. sovereign immunity has been waived for the underlying action

 Under HRS § 661–1,[26] sovereign immunity is waived in all claims against the State founded upon any statute. HRS § 661–1(1). In this case, the legislature has waived the State's sovereign immunity for the action underlying this case, through HRS § 343–7. At the time Sierra Club filed its complaint, HRS section 343–7 provided:

> (a) Any judicial proceeding, *the subject of which is the lack of assessment required under section 343–5,* shall be initiated within one hundred twenty days of the

---

26. HRS § 661–1 provides:

The several circuit courts of the State and, except as otherwise provided by statute or rule, the several state district courts shall, subject to appeal as provided by law, have original jurisdiction to hear and determine the following matters, and, unless otherwise provided by law, shall determine all questions of fact involved without the intervention of a jury.

(1) *All claims against the State founded upon any statute of the State;* or upon any regulation of an executive department; or upon any contract, expressed or implied, with the State, and all claims which may be referred

to any such court by the legislature; provided that no action shall be maintained, nor shall any process issue against the State, based on any contract or any act of any state officer which the officer is not authorized to make or do by the laws of the State, nor upon any other cause of action than as herein set forth.

(2) All counterclaims, whether liquidated or unliquidated, or other demands whatsoever on the part of the State against any person making claim against the State under this chapter.

HRS § 661–1 (1993) (emphasis added).

agency's decision to carry out or approve the action, or, if a proposed action is undertaken without a formal determination by the agency that a statement is or is not required, a judicial proceeding shall be instituted within one hundred twenty days after the proposed action is started. The council or office, any agency responsible for approval of the action, or the applicant shall be adjudged an aggrieved party for the purposes of bringing judicial action under this subsection. *Others, by court action, may be adjudged aggrieved.*

(b) Any judicial proceeding, *the subject of which is the determination that a statement is required for a proposed action,* shall be initiated within sixty days after the public has been informed of such determination pursuant to section 343–3. Any judicial proceeding, the subject of which is the determination that a statement is not required for a proposed action, shall be initiated within thirty days after the public has been informed of such determination pursuant to section 343–3. The council or the applicant shall be adjudged an aggrieved party for the purposes of bringing judicial action under this subsection. *Others, by court action, may be adjudged aggrieved.*

(c) Any judicial proceeding, *the subject of which is the acceptance of an environmental impact statement required under section 343–5,* shall be initiated within sixty days after the public has been informed pursuant to section 343–3 of the acceptance of such statement. The council shall be adjudged an aggrieved party for the purpose of bringing judicial action under this subsection. Affected agencies *and persons who provided written comment to such statement during the designated review period shall be adjudged aggrieved*

*parties* for the purpose of bringing judicial action under this subsection; provided that the contestable issues shall be limited to issues identified and discussed in the written comment.

HRS § 343–7 (1993) (emphases added).[27] As this court noted in *Sierra Club I,* "[HRS chapter 343] provides for judicial review at various stages of the process: (1) when no EA is prepared, (2) [when] an agency determines that an EIS will or will not be required, and (3) when an EIS is accepted." 115 Hawai'i at 308, 167 P.3d at 301 (citing HRS § 343–7(a)–(c)).

This court has stated that "it is well-settled that statutory construction dictates that an interpreting court should not fashion a construction of statutory text that ... creates an absurd or unjust result." *Nihi Lewa, Inc. v. Dep't of Budget & Fiscal Servs.,* 103 Hawai'i 163, 168, 80 P.3d 984, 989 (2003) (internal quotation marks and brackets omitted) (quoting *Dines v. Pacific Ins. Co., Ltd.,* 78 Hawai'i 325, 337, 893 P.2d 176, 188 (1995)). Although the text of HRS § 343–7 does not explicitly state that suits may be brought against the State, interpreting the text of subsections (a), (b), and (c) as something other than a waiver of sovereign immunity would create an absurd result.

HRS § 343–7 specifies when judicial actions may be initiated to challenge: (1) "*the lack of assessment required under section 343–5,*" HRS § 343–7(a) (emphasis added); (2) "the determination that a statement is required for a proposed action," HRS § 343–7(b); or (3) "the acceptance of an environmental impact statement required under section 343–5," HRS § 343–7(c). Under HRS chapter 343, actions initiated by both agencies and applicants require the preparation of environmental assessments. *See* HRS § 343–5(b), (c).[28] More significantly, only a

---

27. There have been no subsequent amendments to HRS section 343–7.

28. At the time Sierra Club filed its complaint, HRS § 343–5(b) provided in relevant part:

Whenever an agency proposes an action in subsection (a), other than feasibility or planning studies for possible future programs or projects that the agency has not approved, adopted, or funded, or other than the use of state or county funds for the acquisition of

unimproved real property that is not a specific type of action declared exempt under section 343–6, *the agency shall prepare an environmental assessment for such action at the earliest practicable time to determine whether an environmental impact statement shall be required.* HRS § 343–5(b) (1993 & Supp.2004) (emphasis added). At the time Sierra Club filed its complaint, HRS § 343–5(c) provided in relevant part:

Whenever an applicant proposes an action specified by subsection (a) that requires ap-

state agency can prepare and determine whether a statement is required for a proposed action. *See* HRS § 343–5(b), (c). Similarly, the final acceptance of an environmental impact statement rests with the governor, a mayor, or an approving agency. *See* HRS § 343–5(b), (c).[29] Through HRS § 343–7, the legislature authorized judicial review of actions that can only be carried out by state agencies or political subdivisions of the State. *See* HRS § 343–7.

HRS § 343–7 also provides that these lawsuits may be brought by parties, other than the agency or the applicant, who "may be adjudged aggrieved." HRS § 343–7(b), (c). This court stated in *Sierra Club I* that

> we have interpreted the "adjudged" aspect of this phrase to mean no more than that a party "must show in a court action brought under § 343–7(a) that they are aggrieved and must be adjudged aggrieved, *in concert with a challenge* to the lack of an EA statement." [*Sierra Club v.] Hawai'i Tourism Auth.*, 100 Hawai'i [242,] 262, 59 P.3d [877,] 897 [ (2002) ] (plurality opinion) (emphasis added). No special finding is required-but a plaintiff must bear the burden of establishing standing as they would in any other matter. *See also Kepo'o v. Kane*, 106 Hawai'i 270, 285, 103 P.3d 939, 954 (2005).

115 Hawai'i at 328 n. 40, 167 P.3d at 321 n. 40 (emphasis in original). As stated previously, this court found in *Sierra Club I* that Sierra

Club had established procedural standing in this case. *Id.* at 333, 167 P.3d at 326.

Accordingly, HRS § 343–7 waived the state's sovereign immunity against actions brought to challenge: (1) the lack of an EA, (2) the determination that an EIS is or is not required, and (3) the acceptance of an EIS.

### ii. waiver of sovereign immunity renders the State liable to the same extent as other litigants

■ Despite the waiver of the State's sovereign immunity by HRS § 343–7, DOT contends that the legislature has nowhere waived the State's sovereign immunity for attorney's fees resulting from HRS chapter 343 litigation. As such, DOT argues that attorney's fees cannot be awarded against the State in this case. *Id.* We disagree.

We addressed a similar question in *Fought* and determined that the State would be not be treated differently from private parties when awarding attorney's fees against the non-prevailing party in actions of assumpsit. *Fought*, 87 Hawai'i at 54–55, 951 P.2d at 504–05. In *Fought*, this court held that the doctrine of sovereign immunity did not prevent an award of attorney's fees against DOT under HRS § 607–14, which authorized attorney's fees awards " 'in all actions in the nature of assumpsit and in all actions on a promissory note or other contract in writing'

---

proval of an agency and that is not a specific type of action declared exempt under section 343–6, *the agency initially receiving and agreeing to process the request for approval shall prepare an environmental assessment of the proposed action at the earliest practicable time to determine whether an environmental impact statement shall be required.* The final approving agency for the request for approval is not required to be the accepting authority. HRS § 343–5(c) (1993 & Supp.2004) (emphasis added).

29. HRS § 343–5(b) addresses actions initiated by an agency, and at the filing of Sierra Club's complaint, HRS 343–5(b) provided in relevant part:

The final authority to accept a final statement shall rest with:
(1) *The governor, or the governor's authorized* representative, whenever an action proposes the use of state lands or the use of state

funds, or whenever a state agency proposes an action within the categories in subsection (a); or
(2) The mayor, or the mayor's authorized representative, of the respective county whenever an action proposes only the use of county lands or county funds.
HRS § 343–5(b)(1993 & Supp.2004). HRS § 343–5(c) addresses actions initiated by applicants, and at the time Sierra Club filed its complaint, HRS 343–5(c) provided in relevant part: *The authority to accept a final statement shall rest with the agency* initially receiving and agreeing to process the request for approval. The final decision-making body or approving agency for the request for approval is not required to be the accepting authority. The planning department for the county in which the proposed action will occur shall be a permissible accepting authority for the final statement.
HRS § 343–5(c) (1993 & Supp.2004) (emphasis added).

and does not limit an award of [attorney's] fees to non-governmental parties." 87 Hawai'i at 54, 951 P.2d at 504 (quoting *Hawaiian Isles Enters. v. City & County of Honolulu*, 76 Hawai'i 487, 493, 879 P.2d 1070, 1076 (1994)). This court reconfirmed in *Fought* the broad interpretation of HRS § 607–14 that allowed an award of attorney's fees against the State where a statute did not specifically address governmental parties.

The analysis in *Fought* further addressed and distinguished the proposition that "an award of [attorney's] fees … is precluded by the principle that statutes of general applicability do not bind the state unless their plain language expressly so indicates[,]" *id.* at 55, 951 P.2d at 505, as was announced in *A.C. Chock, Ltd. v. Kaneshiro*, 51 Haw. 87, 451 P.2d 809 (1969):

> Thus, in *Chock*, there was no clear waiver of the state's sovereign immunity from suit. Were the same true here, the imposition of costs and [attorney's] fees against the DOT would obviously be prohibited. However, in contrast to the statute at issue in *Chock*, HRS § 661–1(1) *expressly* waives the state's immunity from suit "upon any contract, expressed or implied[.]" When the state has consented to be sued, its liability is to be judged under the same principles as those governing the liability of private parties…. HRS § 607–14 does not create a novel claim for relief, but merely establishes the circumstances un-

der which the prevailing party in any action "in the nature of assumpsit" or on some "other contract" may recover the expenses of litigation as an additional element of the prevailing party's damages. Accordingly, a further waiver of sovereign immunity is not necessary in order for HRS § 607–14 to apply to the state and its respective agencies in matters in which, by virtue of the express waiver of sovereign immunity set forth in HRS § 661–1, the state (or any of its agencies) has become a party.

*Fought*, 87 Hawai'i at 56, 951 P.2d at 506 (emphasis in original).

The distinction identified in *Fought* is relevant in this case. "When the [S]tate has consented to be sued, its liability is to be judged under the same principles as those governing the liability of private parties." *Id.* In this case, as discussed previously, there has been a clear waiver of the State's sovereign immunity from suit through HRS § 661–1(1) and HRS § 343–7. *See* Part IV. C.3.c.i. As such, DOT will be "judged under the same principles as those governing the liability" of Superferry for attorney's fees resulting from a violation of HRS chapter 343. As the facts of this case satisfy all three prongs of the private attorney general doctrine, DOT and Superferry are jointly liable for the attorney's fees award granted to Sierra Club pursuant to the private attorney general doctrine.[30]

30. The concurring and dissenting opinion relies on *Taomae v. Lingle*, 110 Hawai'i 327, 132 P.3d 1238 (2006), to suggest that attorney's fees should not be awarded against DOT in this case. We respectfully disagree, as *Taomae* is distinguishable from this case in two important ways, making it inapposite.

First, in *Taomae*, there was no statutory waiver of sovereign immunity for the underlying action; instead, sovereign immunity was not implicated because the suit was for injunctive relief. Where a party seeks only injunctive relief, the ability to sue the state does not stem from a *waiver* of sovereign immunity, but from the fact that sovereign immunity does not bar the suit in the first place. Therefore, there was no clear statutory waiver present in *Taomae* that could be extended to attorney's fees, as there was in *Fought* and in this case.

Second, in *Taomae* this court rejected all of the plaintiffs' alleged bases for attorney's fees on other grounds, leaving no valid basis for allowing fees in that case, regardless of sovereign immuni-

ty. To the contrary, in this case there is a valid additional basis for fees, the private attorney general doctrine, which was not present in *Taomae*. This court in *Taomae* rejected on its merits the plaintiffs' argument that they were entitled to attorney's fees pursuant to HRS § 11–175. As to the plaintiffs' other fee arguments, this court said that, because "[the p]laintiffs' arguments that [attorney's] fees should be awarded pursuant to (1) HRS § 602–5(7), (2) this court's inherent equitable powers, and (3) the private attorney general doctrine, were raised for the first time in their reply memorandum[,] … we deny the request for fees *on such grounds*." 110 Hawai'i at 333–34 n. 14, 132 P.3d at 1244–45 n. 14 (emphasis added). Therefore, in *Taomae*, there was no valid basis for awarding fees. Hence, we believe that *Fought* provides a more appropriate framework than *Taomae* for analyzing sovereign immunity as it applies to attorney's fees in this case, because, as in *Fought*, here there was both (1) a clear statutory waiver for the underlying action,

Accordingly, the circuit court did not err in relying on the private attorney general doctrine as a basis for its award of attorney's fees against DOT and Superferry jointly.

#### 4. Challenges to the Amount of Attorney's Fees and Costs Awarded by the Circuit Court

Superferry contends that the circuit court erred in awarding Sierra Club attorney's fees at the rate of $200 per hour, and awarding costs in the amount of $5,442.44. On the other hand, Sierra Club contends that the circuit court erred by (1) not awarding attorney's fees and costs for the period of litigation prior to the initial appeal to this court; (2) not considering or giving weight to documents presented by Sierra Club on the issue of whether DOT and Superferry "relied in good faith" as required by HRS § 607–25(e)(3); and (3) not awarding attorney's fees at the rate of $300 per hour.

We resolve these issues as follows.

1. The circuit court's award of attorney's fees and costs is reviewed under the abuse of discretion standard. The circuit court did not abuse its discretion when it awarded Sierra Club attorney's fees at counsel's regular rate of $200 per hour. The fact that counsel provided Sierra Club, as a "non-profit or unincorporated environmental organization[ ]," with a discounted hourly rate of $190 and gave additional discounts over the course of the litigation did not make the court's award unreasonable, particularly when counsel was seeking an enhanced fee of $300 per hour based upon the test for enhancement of fees established in *Schefke v. Reliable Collection Agency, Ltd.,* 96 Hawai'i 408, 452–54, 32 P.3d 52, 96–98 (2001) (providing that to enhance the lodestar amount trial courts must determine: "(1) whether an attorney has taken a case on a contingent basis, . . . (2) whether the attorney has been able to mitigate the risk of nonpayment in any way, . . . and (3) whether other factors besides the risk of nonpayment also justify enhancement." (Internal citations, quotation marks, and brackets removed.)).

■■■ 2. The circuit court did not abuse its discretion in awarding costs of $5,442.44 against DOT and Superferry jointly. As the prevailing party, Sierra Club was entitled to an award of all costs pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(d)(1) [31] and HRS § 607–24.[32] However, as Sierra Club does not oppose the exclusion of $910.35 in costs that Superferry challenges as costs "related to the operation of a law practice," we reduce the amount of costs awarded from $5,442.44 to $4,532.09.

and (2) an additional, albeit general, basis for awarding attorney's fees.

**31.** HRCP Rule 54(d)(1) provides:

Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the State or a county, or an officer or agency of the State or a county, shall be imposed only to the extent permitted by law. Costs may be taxed by the clerk on 48 hours' notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court.

HRCP Rule 54(d)(1). Superferry contends that Sierra Club should not be entitled to an award of costs based on HRCP Rule 54(d)(1), because the trial court did not include this basis in its March 27, 2008 order granting Sierra Club its reasonable attorney's fees and costs. Superferry argues that Sierra Club did not challenge this omission; therefore, the issue is waived on appeal pursuant to HRAP 28(b)(7). We disagree. This court has consistently held that "where the decision below is correct it must be affirmed by the appellate court even though the lower tribunal gave the wrong reason for its action." *State v. Taniguchi,* 72 Haw. 235, 240, 815 P.2d 24, 26 (1991) (citing *State v. Rodrigues,* 68 Haw. 124, 134, 706 P.2d 1293, 1300 (1985)). Accordingly, Sierra Club is entitled to an award of costs pursuant to HRCP Rule 54(d)(1).

**32.** HRS § 607–24 provides in relevant part:

*In all cases* in which a final judgment or decree is obtained against the State, county, or other political subdivision or any board or commission thereof, *any and all deposits for costs made by the prevailing party shall be returned to the prevailing party, and the prevailing party shall be reimbursed by the State,* county, or other political subdivision, board, or commission thereof, as the case may be, *all actual disbursements, not including attorney's fees or commissions, made by the prevailing party and approved by the court.*

HRS § 607–24 (1993) (emphases added). DOT's sole challenge to the costs award was based on its contention that Sierra Club was not the prevailing party. As we have concluded that Sierra Club was the prevailing party in this case, Sierra Club is entitled to an award of costs against the State pursuant to HRS § 607–24.

3. The circuit court did not abuse its discretion in (a) not awarding Sierra Club attorney's fees and costs for the period of litigation prior to the initial appeal to this court; (b) not considering or giving weight to documents presented by Sierra Club on the issue of whether DOT and Superferry "relied in good faith" as required by HRS § 607–25(e)(3), and (c) not awarding attorney's fees to Sierra Club at the rate of $300 per hour.

## V. CONCLUSION

■ Article XI, section 5 of Hawai'i's Constitution limits the exercise of legislative power over State lands to the enactment of general laws:

> The legislative power over the lands owned by or under the control of the State and its political subdivisions shall be exercised *only by general laws*[.]

Haw. Const. art. XI, § 5 (emphasis added).

Act 2 is a special law which violates this constitutional mandate.[33] As discussed in detail earlier herein, the repealing provision set forth in section 18 of Act 2 necessarily limits its application of favorable treatment to Superferry, an illusory "class of one," as the possibility of another large capacity ferry vessel company coming within the benefits of Act 2 within the limited time of Act 2's viability is theoretical at best. Realistically, Act 2 was conceived, drafted, and enacted to accomplish the specific purpose of allowing Superferry, and Superferry alone, to operate without satisfying the requirements of Chapter 343 of the Hawai'i statutes. By its own repealing language, once this purpose was accomplished, Act 2 will die before it can accomplish a like purpose for another entity.

Act 2 having been found to be unconstitutional, the requirements of the general law

set forth in HRS chapter 343 are applicable to Superferry. Based upon the foregoing, we reverse the circuit court's final judgment of January 31, 2008 in favor of DOT and Superferry. We affirm, in part, the circuit court's March 27, 2008 order granting (1) Sierra Club attorney's fees in the amount of $86,270.28 against DOT and Superferry jointly based on the private attorney general doctrine, and (2) costs in the reduced amount of $4,532.09 against DOT and Superferry jointly. We further remand this case to the circuit court for such other and further disposition of any remaining claims as may be appropriate and consistent with this opinion.

ACOBA and DUFFY, JJ., and Circuit Judge TOWN, in Place of LEVINSON, J., Recused; with NAKAYAMA, J., Concurring Separately and Dissenting, with whom MOON, C.J., joins.

Concurring and Dissenting Opinion by NAKAYAMA, J., in which MOON, C.J., Joins.

I concur with the majority's conclusions that (1) Act 2 constitutes unconstitutional special legislation, (2) the circuit court did not err in finding that Sierra Club was the prevailing party in this case, and (3) the private attorney general doctrine authorizes an award of attorney's fees in favor of Sierra Club and against Superferry. Because attorney's fees should be awarded against Superferry pursuant to the private attorney general doctrine, it would seem understandably fair based on the facts and circumstances of this case to also award fees against DOT on the same basis. The majority appears to take this position through the following statement, which was quoted from this court's

**33.** Our holding is based solely on our "general law" analysis and does not in any way involve an "equal protection" analysis, which involves a different standard. As stated by the Arizona Supreme Court:

> Although similar policies are involved, constitutional prohibitions against special legislation serve a purpose distinguishable from equal protection provisions. Equal protection is de-

nied when the state unreasonably discriminates agianst a person or class. Prohibited special legislation, on the other hand, unreasonably and arbitrarily discriminates in favor of a person or class by granting them a special or exclusive immunity, privilege, or franchise. *Republic Inv. Fund I v. Town of Sunrise*, 800 P.2d 1251, 1256 (Ariz. 1990) (quoting *Arizona Downs v. Arizona Horsemen's Found.*, 637 P.2d 1053, 1060 (Ariz. 1981).

opinion in *Fought & Co. v. Steel Engineering & Erection, Inc.*, 87 Hawai'i 37, 56, 951 P.2d 487, 506 (1998): "When the [S]tate has consented to be sued, its liability is to be judged under the same principles as those governing the liability of private parties." Majority opinion at 229, 202 P.3d at 1274 (brackets in original). Thus, a legal basis for such an award could, perhaps, be gleaned by extending this court's sovereign immunity discussion in *Fought* to this case. However, in my view both the issue of attorney's fees and the private attorney general doctrine are beyond the scope of the state's waiver of sovereign immunity in this case, *see Chun v. Board of Trustees of Employees' Retirement System of State*, 106 Hawai'i 416, 432, 106 P.3d 339, 355 (2005), thereby requiring a further waiver of sovereign immunity beyond the state's consent to be sued. *See Fought*, 87 Hawai'i at 56, 951 P.2d at 506; *see also Taomae v. Lingle*, 110 Hawai'i 327, 333, 132 P.3d 1238, 1244 (2006).

In *Fought*, this court addressed the issue of whether sovereign immunity barred an award of attorney's fees arising from an action in the nature of assumpsit, the outcome of which depended largely on this court's interpretation of a statute of "unrestricted application" that is entitled, "Attorneys' fees in actions in the nature of assumpsit, etc." *See* 87 Hawai'i at 54–56, 951 P.2d at 504–06 (interpreting HRS § 607–14 (Supp.1997)).[1] " 'Assumpsit' is 'a common law form of action which allows for the recovery of damages for non-performance of a contract, either express or implied, written or verbal, as well as quasi contractual obligations.' " *Blair v. Ing*, 96 Hawai'i 327, 332, 31 P.3d 184, 189 (2001) (citations and brackets omitted). Clearly,

the underlying action in this case did not consist of a dispute seeking "the recovery of damages for non-performance of a contract, either express or implied[.]" *See id.*

Insofar as attorney's fees in assumpsit actions are concerned, this court has said in a case prior to *Fought* that "HRS § 607–14 governs the award of attorneys' fees 'in all actions in the nature of assumpsit and in all actions on a promissory note or other contract in writing and does not limit an award of attorneys' fees to non-governmental parties." *Hawaiian Isles Enter. Inc. v. City & County of Honolulu*, 76 Hawai'i 487, 493, 879 P.2d 1070, 1076 (1994). In *Fought*, this court could "only presume," due to "[c]onsiderations of *stare decisis*," that "the legislature agree[d] with our interpretation" of HRS § 607–14 in *Hawaiian Isles*, and could "discern no good reason to change" that interpretation. 87 Hawai'i at 54–55, 951 P.2d at 504–05. Nonetheless, the state defendants in *Fought* asserted that "the doctrine of sovereign immunity forecloses Kiewit from being awarded costs and attorneys' fees against [the state][,]" and *Hawaiian Isles* either did not apply to that case or should be overruled. *Id.* at 54, 951 P.2d at 504. This court thus took the opportunity to explain further its reasoning regarding HRS § 607–14. *Id.* at 55, 951 P.2d at 505.

The unrestricted application of HRS § 607–14 is noteworthy, inasmuch as the liability of state agencies for certain other litigation-related expenses is expressly restricted elsewhere. For example, HRS § 607–24 (1993) provides, *inter alia*, that state agencies are exempt from requirements that a bond be posted for costs, on a motion for new trial, or on appeal....

---

1. As quoted by this court in *Fought*, HRS § 607–14 provided, in pertinent part:

**Attorney's fees in actions in the nature of assumpsit, etc.** In all courts, in all actions in the nature of assumpsit ..., there shall be taxed as attorneys' fees to be paid by the losing party and to be included in the sum for which execution may issue, a fee that the court determines to be reasonable; provided that the attorney representing the prevailing party shall submit to the court an affidavit stating the amount of time the attorney spent on the action and the amount of time the attorney is likely to spend to obtain a final written judgment, or, if the fee is not based on an hourly

rate, the amount of the agreed upon fee. The court shall then tax attorneys' fees, which the court determines to be reasonable, to be paid by the losing party; provided that this amount shall not exceed twenty-five per cent of the judgment.

....

The above fees provided for by this section shall be assessed on the amount of the judgment exclusive of costs and all attorneys' fees obtained by the plaintiff, and upon the amount sued for if the defendant obtains a judgment. 87 Hawai'i at 41 n.2, 951 P.2d at 491 n. 2 (quoting HRS § 607–14) (ellipses in original).

Similarly, HRS § 661–8 expressly prohibits an award of prejudgment interest against state agencies.... This court has consistently applied the rule of *expressio unius est exclusio alterius*—the express inclusion of a provision in a statute implies the exclusion of another—in interpreting statutes.... Applied here, the rule leads to the conclusion that, where the state's liability has not been expressly restricted, normal contract remedies are available against state agencies.

*Id.* (ellipses added).

Because HRS § 661–1(1) "expressly waive[d] the state's immunity from suit 'upon any contract, expressed or implied[,]'" and HRS § 607–14 "merely establishes the circumstances under which the prevailing party in any action 'in the nature of assumpsit' or on some 'other contract' may recover the expenses of litigation as an additional element of the prevailing party's damages[,]" this court ultimately held that "a *further waiver* of sovereign immunity is not necessary in order for HRS § 607–14 to apply to the state and its respective agencies in matters in which, by virtue of the express waiver of sovereign immunity set forth in HRS § 661–1, the state (or any of its agencies) has become a party." *Id.* at 56, 951 P.2d at 506 (emphasis added).

The emphasized portion of this court's holding in *Fought* is crucial to resolving the issue before us; that is, whether a claim of attorney's fees against the state even requires a "further waiver" of sovereign immunity beyond the state's consent to be sued. The majority answers this question in the negative based on this court's statement in *Fought* that "[w]hen the [S]tate has consented to be sued, its liability is to be judged under the same principles as those governing the liability of private parties." Majority opinion at 229, 202 P.3d at 1274 (quoting *Fought*, 87 Hawai'i at 56, 951 P.2d at 506) (internal quotation marks omitted) (brackets added and in original). So construed, the majority holds that the private attorney general doctrine applies to DOT because it must "be judged under the same principles as those governing the liability of private parties"; namely, Superferry. Majority opinion at 229, 202 P.3d at 1274.

I agree that, in this case, "there has been a clear waiver of the State's sovereign immunity from suit through HRS § 661–1(1) and HRS § 343–7." Majority opinion at 229, 202 P.3d at 1274. Although based on a different part of HRS § 661–1(1), HRS § 661–1(1) was also the basis upon which this court in *Fought* found that the state had consented to be sued. *See* 87 Hawai'i at 56, 951 P.2d at 506. However, unlike HRS § 607–14, neither HRS § 661–1(1) nor HRS § 343–7 addresses the issue of attorney's fees against the state. As such, the majority appears to be saying that a state's consent to be sued through HRS § 661–1(1) is alone sufficient to constitute a waiver of the state's sovereign immunity on the issue of awarding attorney's fees against the state. Majority opinion at 228–30, 202 P.3d at 1273–75. However, such a conclusion would mean that this court's thorough discussion of HRS § 607–14 in *Fought* would have been unnecessary. I do not believe that this court intended that result.

Indeed, remarkably similar to the majority's reasoning in this case, the plaintiffs in *Taomae* "[sought] to extend *Fought* here in declaring that 'if sovereign immunity does not bar the underlying action, then no waiver is required for the imposition of [attorney's] fees and costs.'"[2] 110 Hawai'i at 333, 132

---

**2.** The majority states that *Taomae* is distinguishable from this case because "there was no clear statutory waiver present in *Taomae* that could be extended to attorney's fees, as there was in *Fought* and in this case." Majority opinion at 229, 202 P.3d at 1274 n. 30. I respectfully disagree.

In *Fought*, it was unnecessary for this court to extend the state's consent to be sued under HRS § 661–1(1) to the issue of attorney's fees because HRS § 607–14 addressed the attorney's fees issue in that case. The dispositive issue in *Fought*

was whether HRS § 607–14, which by its plain language neither included nor excluded the state, applied to the state. The statute of "unrestricted application" that was at issue in *Fought* was not HRS § 661–1(1). Therefore, it could likewise be said that *Fought* is distinguishable from this case because interpreting the plain language of HRS § 661–1 was not before this court in that case.

Nonetheless, as discussed above, I understand the reasoning behind the majority's position to extend this court's analysis of HRS § 607–14 in *Fought* to HRS § 661–1(1). However, I believe

P.3d at 1244. Ultimately, this court held that the plaintiffs' "contention is not persuasive and ... an award of fees based on this argument is denied" for the following reasons:

First, the matter before this court is not in the nature of assumpsit and does not implicate HRS §§ 607–14 or 661–1. Second, simply because "sovereign immunity did not bar the instant contest," as the Plaintiffs state, it cannot be assumed that an assessment of fees and costs is appropriate. It is true that sovereign immunity does not bar the proceedings before this court inasmuch as this case involves injunctive relief. *See* [*Pele Defense Fund v. Paty,* 73 Haw. 578, 610 n. 21, 837 P.2d 1247, 1266 n. 21 (1992) ] (noting that sovereign immunity "will not preclude suits brought to enjoin" violations of the Hawai'i Constitution). However, *the fact that sovereign immunity does not preclude this court from addressing the merits of this case does not necessarily result in a right to attorney's fees.* Here, Plaintiffs have not demonstrated an entitlement to fees under *Fought.* And unlike in *Fought, no statute authorizes a shift in fees to Defendants.* Accordingly, Plaintiffs' request for attorneys' fees on this basis must be denied.

*Id.* (emphases added).

Nonetheless, I understand the majority's reasoning to extend this court's analysis in *Fought* to this case. However, even if we were to do so, in my view the issue of attorney's fees would be beyond the scope of the state's waiver of sovereign immunity.

Notably, in *Fought,* this court observed:

[T]he courts of other jurisdictions have recognized that an award of costs and fees to a prevailing party is inherently in the nature of a damage award. *See Donovan v. Delaware Water and Air Resources Comm'n,* 358 A.2d 717, 723 (Del.1976) (quoting *Peyton v. William C. Peyton Corp.,* 8 A.2d 89, 91 (Del.1939)) (" 'Costs

are allowances in the nature of incidental damages awarded by law to reimburse the prevailing party for expenses necessarily incurred in the assertion of his rights in court.' "); *Department of Transp. v. Fru-Con Constr.,* 206 Ga.App. 821, 426 S.E.2d 905, 909 (1992) (quoting *Brown v. Baker,* 197 Ga.App. 466, 398 S.E.2d 797 (1990)) (" 'Th[e attorneys' fee] statute *merely establishes the circumstances in which a plaintiff may recover the expenses of litigation as an additional element of damages.*' "); *In re Gas Water Heater Prods. Litigation,* 697 So.2d 341, 345 (La.Ct.App. 1997) (citing *Woodmen of the World Life Ins. Soc'y v. Hymel,* 610 So.2d 195 (La.Ct. App.1992)) ("Under Louisiana law, attorneys' fees are not recoverable as an element of damages unless they are provided for by statute or contract.").

87 Hawai'i at 51–52, 951 P.2d at 501–02 (ellipses and emphasis added) (brackets added and in original). Consistent with this observation, this court concluded that HRS § 607–14 "does not create a novel claim for relief, but merely establishes the circumstances under which the prevailing party in any action 'in the nature of assumpsit' or on some 'other contract' may recover the expenses of litigation as an *additional* element of the prevailing party's damages." *Id.* at 56, 951 P.2d at 506 (emphasis added). By its plain language, HRS § 661–1(1) waives the state's immunity for "[a]ll claims against the State founded ... upon any contract, expressed or implied[.]" Inasmuch as damages were awarded against the state in *Fought,* 87 Hawai'i at 42, 951 P.2d at 492 (awarding $392,000 plus interest at the rate of ten percent per annum as "compensation for the alleged breach" of contracts), attorney's fees, as an "additional element of the prevailing parties damages," *id.* at 56, 951 P.2d at 506, would be well within the "claim[ ] against the State...." *See* HRS § 661–1(1); *see also Blair,* 96 Hawai'i at 332, 31 P.3d at 189 (" 'Assumpsit' is 'a common law form of action which *allows for*

---

such an extension to be unwise for the following reasons: (1) unlike *Fought,* this case is not an action in the nature of assumpsit; (2) also unlike *Fought,* the circuit court did not award damages as a remedy for the underlying action in this

case; and (3) insofar as *Fought* is relevant to this case, in my view a "further waiver" of sovereign immunity is required beyond the state's consent to be sued in light of reasons (1) and (2) above.

*the recovery of damages* for non-performance of a contract[.]" (Emphasis added.)).

However, in this case, we cannot treat attorney's fees as an "additional element of the prevailing party's damages" because damages was not an issue in the underlying claim. Instead, Sierra Club sought injunctive relief. Whether damages should be awarded in the form of attorney's fees is a separate and distinct issue from the relief sought by Sierra Club in the underlying case. *See Fought*, 87 Hawai'i at 51–52, 951 P.2d at 501–02 ("[A]n award of costs and fees to a prevailing party is inherently in the nature of a damage award."). Consequently, in my view, it would be unwise to consider damages as a part of Sierra Club's "claim against the State[,]" which in this case was "founded upon [a] statute of the State." *See* HRS § 661–1(1). Therefore, and with all due respect, I believe it would be unwise to extend *Fought* in the manner that the majority is suggesting because the issue of attorney's fees in this case is beyond the scope of the state's waiver of sovereign immunity through HRS § 661–1(1). *See Chun*, 106 Hawai'i at 432, 106 P.3d at 355 ("[A] waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign[.]" (Internal quotation marks and citations omitted.)); *see also Lehman v. Nakshian*, 453 U.S. 156, 161, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981) ("[L]imitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." (Internal quotation marks and citation omitted.)). Accordingly, on this basis, I would hold that a further waiver of sovereign immunity is required in this case. *See Fought*, 87 Hawai'i at 56, 951 P.2d at 506; *see also Taomae*, 110 Hawai'i at 333, 132 P.3d at 1244.

There is another basis that suggests that attorney's fees in this case is beyond the scope of the state's waiver of sovereign immunity. To reiterate, *Fought* is largely a statutory interpretation case inasmuch as the plain language of HRS § 607–14 does not expressly include or exclude the state. Hence, this court utilized a rule of statutory construction, *expressio unius est exclusio alterius,* to explain that "where the state's liability has not been expressly restricted, normal contract remedies are available against state agencies." *Fought*, 87 Hawai'i at 55, 951 P.2d at 505. HRS § 607–14's application to the state defendants was made even clearer by HRS § 661–1(1)'s express waiver of sovereign immunity "from suit 'upon any contract, express or implied[.]' " *Id.* at 56, 951 P.2d at 506 (quoting HRS § 661–1(1)) (brackets in original). According to the majority, this consent alone is enough to attach "liability" "under the same principles as those governing the liability of private parties." Majority opinion at 229, 202 P.3d at 1274. With regard to attorney's fees, the majority appears to be saying that the "principle[ ]" governing the liability of the state in this case is the private attorney general doctrine. *See* Majority opinion at 229, 202 P.3d at 1274 ("DOT will be 'judged under the same principles as those governing the liability' of Superferry for attorney's fees resulting from a violation of HRS chapter 343.").

The private attorney general doctrine is a common law exception to the common law "American Rule." *See In re Water Use Permit Applications*, 96 Hawai'i 27, 29, 25 P.3d 802, 804 (2001). Comparatively, HRS § 661–1(1) and HRS § 607–14 are statutes enacted by the Hawaii legislature. As it pertains to this case, HRS § 661–1(1) expressly waives sovereign immunity for " '[a]ll claims against the State founded upon any statute of the State[.]' " The underlying claim in this case was founded upon HRS § 343–7. However, Sierra Club's claim for attorney's fees is based on the common law private attorney general doctrine, and not on any "statute of the State[,]" or on any other basis under HRS § 661–1(1). Therefore, I believe that Sierra Club's claim for attorney's fees through the common law private attorney general doctrine is not within the scope of the state's waiver of sovereign immunity. *See Chun*, 106 Hawai'i at 432, 106 P.3d at 355. Consequently, with regard to the attorney's fees issue in this case, I believe that a further waiver of sovereign immunity is required beyond the state's consent to be sued under HRS § 661–1(1). *See Fought*, 87 Ha-

wai'i at 56, 951 P.2d at 506; *see also Taomae,* 110 Hawai'i at 333, 132 P.3d at 1244.

For these reasons, I respectfully dissent from the majority's conclusion that "[s]overeign immunity does not bar application of the private attorney general doctrine against DOT." *See* Majority opinion at 226–30, 202 P.3d at 1271–75. Accordingly, I would hold that the circuit court erred by awarding attorney's fees against DOT pursuant to the private attorney general doctrine.